IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

PURIS, LLC,                          Jacksonville, Florida

            Plaintiff,              Case No. 3:25-cv-157-TJC-PDB

 v.                                 February 20, 2025

ANDREW J. MAYER,                     11:01 a.m. to 12:26 p.m.

            Defendant.              Courtroom No. 10-D
_____


MOTION HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE

COURT REPORTER:

        Heather Randall, RPR
        221 North Hogan Street, #185
        Jacksonville, Florida 32202
        Telephone:  (904) 549-1307
        randall4817@yahoo.com


                (Proceedings recorded by mechanical stenography;
                        transcript produced by computer.)

1                    A P P E A R A N C E S

2

3   COUNSEL FOR PLAINTIFF:

4        R. THADDEUS BEHRENS, ESQUIRE
         JACOB FIELDS, ESQUIRE
5        Allen Overy Shearman Sterling US, LLP
         2601 Olive Street
6        17th Floor
         Dallas, Texas 75201
7
         LAUREN VICKROY PURDY, ESQUIRE
8        REBECCA MATURO, ESQUIRE
         Gunster, Yoakley & Stewart, P.A.
9        1 Independent Drive
         Suite 2300
10       Jacksonville, Florida 32202

11

    COUNSEL FOR DEFENDANTS:
12
         CHRISTOPHER RYAN MALONEY, ESQUIRE
13       JEFFREY S. YORK, ESQUIRE
         Shutts & Bowen, LLP
14       1000 Riverside Avenue
         Suite 800
15       Jacksonville, Florida 32204

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

February 20, 2025                                    11:01 a.m.

                            - - -

            COURT SECURITY OFFICER:  All rise.  The United States
District Court in and for the Middle District of Florida is now
in session, the Honorable Timothy J. Corrigan presiding.

            Please be seated.

            THE COURT:  Good morning.  This is the case of PURIS,
LLC v. Andrew Mayer -- is it Mayer or Mayer?

            MR. MALONEY:  Mayer, Your Honor.

            THE COURT:  That case is numbered 3:25-cv-157.

            Ms. Purdy, would you introduce all of your
colleagues, please?

            MS. PURDY:  Good morning, Your Honor.  Lauren Purdy
with the Gunster law firm.  With me at counsel table, first is
the associate from our office, Rebecca Maturo.  And then my
co-counsel Thad Behrens and Jacob Fields from AO Shearman and
Sterling.

            THE COURT:  Great.

            MS. PURDY:  Thank you.

            THE COURT:  Good to see you all.

            Mr. Maloney, would you enter your appearance and
Mr. York, please.

            MR. MALONEY:  Yes, sir, Your Honor.  Ryan Maloney
with Shutts & Bowen on behalf of the defendant.

1    MR. YORK:  Jeff York with Shutts & Bowen also on
2  behalf of the defendant.

3    THE COURT:  All right.  Good to see everybody.  I
4  always appreciate a good motion for TRO.

5    So I have read the papers.  Of course, I'm familiar
6  with the law.  These types of cases and motions are -- I
7  wouldn't say routine, but we see them on -- with some
8  regularity, so I think I have a general understanding of how
9  this works.  But I've read all of the papers, including the
10  declarations.  And I know that there were some -- even as of
11  yesterday, I think there were papers still coming in, which is
12  not uncommon in a TRO environment.

13    I do have in mind, this is a -- I only have this set
14  for the motion for temporary restraining order, which can be
15  accomplished without notice, but I always prefer to have notice
16  if I can.  And in this case it seemed like I could, and I
17  appreciate everybody hustling around to make that happen.

18    So what I'm going to do is, I'm going to hear, of
19  course, from the movant first and then from the -- from
20  Mr. Mayer's counsel.  And then I'll -- I may have a question or
21  two, and then it's my intention to rule from the bench on the
22  motion for TRO today if I can.  I think I'll be able to.

23    Let's just get started.  And I'll hear from the
24  plaintiff.

25    MR. BEHRENS:  Good morning, Your Honor.  I'll offer

1  the argument this morning.

2        THE COURT:  Okay.

3        MR. BEHRENS:  Good to be here with you.  I do have a

4  handout, if I may approach?

5        THE COURT:  Sure.

6        All right.  Go ahead, sir.  We've been having a

7  little sound difficulty at that podium microphone, so we're

8  working on it.  But if you could keep your voice up, I'll

9  appreciate it.

10        MR. BEHRENS:  I'll do so.  Your Honor, good morning.

11        PURIS is before the Court this morning seeking an

12  emergency temporary restraining order, because a top executive

13  of its water and wastewater pipeline business has joined a

14  direct competitor in violation of an agreement not to compete.

15  This is not an ordinary noncompete case.  Because of the key

16  leadership role that Mr. Mayer occupied with PURIS, he is

17  uniquely situated to severely and irreparably harm PURIS's

18  business by competing.

19        A word about what PURIS's business is, it's in the

20  waterline infrastructure and renewal business.  It operates

21  through a number of companies, most importantly for today's

22  purposes it's a company called Murphy Pipeline Contractors.

23  And -- we call it MPC.  MPC is based here in Jacksonville.

24  Mr. Mayer founded MPC back in 2000.  It is a market leader in

25  water and wastewater rehabilitation and replacement.  The way

1 it works is, it fans out some 35 different states, 500

2 different municipalities.  And it installs -- it removes and

3 replaces, upgrades pipelines -- big water pipeline systems.  It

4 uses a material called high-density polyethylene, or HDPE.

5       And the way the competition happens in this business

6 is, you bid for jobs with the municipalities.  All of the

7 various players that provide these services would go to the

8 municipalities, compete for the business, and then the work

9 would actually be performed on site.

10       Another facet -- in addition to the wastewater and

11 water pipeline business, another facet of MPC's business was

12 what's called lead-line removal and replacement services.  And

13 in that business, again with municipalities, what MPC would do

14 is, we would identify lead and lead-lined pipes that were

15 running from water mains to home residences and replace that

16 and put it with -- replace it with nontoxic copper lines.  So

17 that's what the business is.

18       Importantly, for today's purposes, PURIS acquired MPC

19 from Mr. Mayer in 2020 for $55,000,000.  A critical condition

20 of PURIS's acquisition of Mr. Mayer's business was that he

21 agreed to stay on and continue to lead the business.  And,

22 importantly, he agreed not to compete either during his tenure

23 or for an 18-month period after his departure from the company.

24       The reasons for the noncompete agreement are obvious

25 in his case.  He is so important to that business as the

1  founder and only president since it's inception.  He was the

2  main driving force behind its revenue, its marketability.  And,

3  effectively, what PURIS was buying was the accumulation of his

4  knowledge, contacts, technical expertise, goodwill, etcetera.

5        THE COURT:  Well, if he was so important, why'd you

6  fire him?

7        MR. BEHRENS:  Actually -- we actually very much

8  wanted to keep him.  Mr. -- as I'll go into, Mr. Mayer had

9  demands for tens of millions of dollars to stay and also wanted

10  to be released from his noncompete.  That's what was ultimately

11  unacceptable to PURIS and the reason why we decided to part

12  ways in December of 2020.

13        THE COURT:  And the noncompete -- it was December of

14  2024.

15        MR. BEHRENS:  December of 2024.  Pardon me, I

16  misspoke.

17        THE COURT:  So -- and there's nothing -- there's no

18  differentiation -- I've had noncompete cases where the

19  obligations are different if somebody's fired with cause or

20  without cause.  This noncompete doesn't make that distinction?

21        MR. BEHRENS:  Correct.  A feature of the business was

22  that, regardless of the reasons for his departure, because of

23  the nature of what PURIS was buying, that he would have an

24  18-month sit-out period.

25        THE COURT:  And is there any compensation during that

1 18-month period that he's sitting out or is he just on his own?

2     MR. BEHRENS:  There's no compensation other than what

3 he was paid for the business.  He also remains an equity holder

4 in PURIS.

5     THE COURT:  Okay.  So he's actually a stockholder of

6 the company that's suing him?

7     MR. BEHRENS:  He is.  But when you look at the

8 relative economic terms, he received 55 million upon the

9 purchase and then some number in millions after that.  His

10 stake -- his continuing stake in PURIS is 7 million dollars,

11 which pales in comparison to what he received and explains some

12 of the economic incentive for him to begin with a competing

13 business.

14     So the noncompete agreement, as Your Honor is

15 familiar from looking at the papers, it prohibits three things:

16 Competing -- engaging in a competing business or assisting

17 another company that competes with PURIS; directly or

18 indirectly soliciting employees to resign or interfering with

19 our relationships; or disclosing or making use of confidential

20 information.

21     So fast-forward to 2024, Your Honor already

22 anticipated this, there was this -- demands that Mr. Mayer was

23 making for increased compensation and to be released from his

24 noncompete as a condition for him continuing.  That was

25 unacceptable.  PURIS agreed to -- decided to terminate him in

1   December.

2        Within a few weeks, as was announced January 25th of

3   2025, Mr. Mayer accepted the position with Crown

4   Electrokinetics Corporation.  And in that release and in

5   Crown's own public documents, it reflects that Crown is

6   engaging and intends to engage in a directly competitive

7   business.  That's laid out in Mr. Fegan's declaration.  He's

8   the CEO of our company.  And I'll lay it out in some detail

9   here.

10        Because of that concern that Mr. Mayer had gone to

11  work for a direct competitor, on February 6th we sent him a

12  cease and desist letter reminding him of his obligations under

13  the agreement --

14        THE COURT:  So is it the case that you can't get

15  there from here meaning that, ipso facto, his employment,

16  Mr. Mayer's employment, by Crown was necessarily going to

17  require him to violate the noncompete; that is, is there -- you

18  know, you saw their papers --

19        MR. BEHRENS:  Yes.

20        THE COURT:  -- they're saying that they were just

21  doing inspections, they weren't doing the actual installations,

22  that they tried to -- that they don't -- they feel like there

23  are aspects of their business that are not competing with you,

24  and that's what he's in.  Is it your position that there's no

25  way that he can be working for Crown and not be competing?

1    MR. BEHRENS:  Because of the business that Crown is

2  engaged in, the answer to that is no, he can't under the terms

3  of the agreement.  Because under the various things that he's

4  restricted from doing, among them, if you look at the TRO,

5  Exhibit 1C -- this is actually slide 2 in the deck that I

6  handed -- in advance of the hearing.  If you look at what he's

7  restricted from doing on the competition side,

8  Subsection (ii)(D) says that, in addition to not engaging in

9  competitive business himself, he can't promote, assist,

10  financially or otherwise, any corporation engaged in any

11  business which competes with the company's business in the

12  restricted territory.

13    So because of that, the question is, does Crown

14  engage in a competitive business within the restricted

15  territory?  And if it does, that is not a place where Mr. Mayer

16  can go to work.  That's the -- just enforcing the plain terms

17  of the agreement.

18    THE COURT:  So your answer is, he couldn't -- he

19  can't work for Crown no matter what?

20    MR. BEHRENS:  Not if they're going to continue doing

21  that business.

22    And I understand that Mr. Mayer put in a declaration

23  yesterday denying that Crown does engage in a competing

24  business.  And I want to walk through why that's not true.

25    THE COURT:  Okay.

1    MR. BEHRENS:  So if I could turn your attention, Your

2    Honor, to slide number 4.  So here is evidence of the competing

3    business.  So one competing business is using these HDPE

4    pipeline solutions.  If you look on the left, that's from MPC's

5    website referring to water and wastewater rehabilitation using

6    HDPE methods.  On the right there's a reference to Crown

7    doing high density polyethylene piping systems.  And you'll see

8    among the customers -- contrary to what Mr. Mayer says in his

9    declaration, among the customers served for that business is

10   municipal -- municipalities.

11   And then secondly, another competing line of business

12   that Crown is engaged in is the lead line services.  On the

13   left is MPC's description of its business in the lead service

14   line, replacement, remediation.  And then, again, as I'll get

15   into, contrary to what Mr. Mayer's declaration says, Crown's

16   website, as of February 18th, had this slide -- had this image

17   on its website.  And it says PE Pipelines, which is a

18   subsidiary of Crown, specializes in the replacement of lead

19   service lines.

20   And then the next question, then, is, once you can

21   see that there's evidence that you're in a competing business,

22   the next question becomes, is that -- is Crown competing within

23   a restricted territory?

24   The next slide, slide 6, shows -- is a depiction of

25   where PURIS was doing business during Mr. Mayer's tenure.

1  Under the agreement it's not only where we're doing business

2  when he departs, but where we did business over which he had

3  supervisory authority during the two years prior to his

4  termination.  The green dots on the map reflect places where

5  PURIS had contracts with different municipalities.

6          THE COURT:  And your reading of the noncompete is

7  that -- did you have projects somewhere that that's a

8  restricted area as opposed to your offices?

9          MR. BEHRENS:  Yes.  Because the nature of the

10  competition in this business is nothing is really occurring at

11  the office.  The nature of this business is wherever Mr. Mayer

12  was personally located -- actually, if I can turn you to the

13  language of the restricted territory definition on slide 3.

14          THE COURT:  Okay.

15          MR. BEHRENS:  Romanette (i) is the geographic

16  location restriction.  What it says is 50-mile radius of any

17  and all company locations in, to, or for which the company --

18  an employee worked, assigned, or had any responsibility, either

19  direct or supervisory.

20          As the leader of this business, Mr. -- of our

21  business, our company's business, Mr. Mayer had supervisory

22  authority of all of the places where we had projects.  And,

23  importantly, it wouldn't have made sense for PURIS, trying to

24  protect itself with this agreement, not to compete, to say the

25  only thing you're restricted from doing, Mr. Mayer, is from

1   taking projects or doing work within 50 miles of the office

2   where you're located.  It was well known when it was purchased,

3   it's the fact of the business that where the work is happening,

4   where the competition is happening, the locations of the -- is

5   the locations of the projects.  That's where the competition's

6   occurring.  And that's what PURIS was trying to protect itself

7   from.

8         If I could -- I want to turn specifically to

9   Mr. Mayer's contentions as to why he's not -- Crown's not

10   engaging in a restricted business.  And I'll start on slide 7.

11   These are quotes from Mr. Mayer's declaration filed yesterday.

12   He says the following:  First, he denies that Crown does any

13   work in removing or otherwise replacing or rehabilitating lead

14   pipe from municipalities.  He says, "Crown's work is limited to

15   inspection but they then don't take the next step of doing the

16   removal and rehabilitation."  It further goes on to say that

17   prior to his joining Crown, Crown agreed not to engage in the

18   rehabilitation for any municipalities during the 18-month

19   period.

20         And then responding to the exhibit we had cited, the

21   December 8, 2024, investor presentation by Crown, which says

22   they are doing rehabilitation and remediation services, he says

23   that between December 8th and January 25th, when that was

24   announced, Crown made the decision that it was no longer going

25   to do what it said it was going to do in its investor

1   presentation.

2          The slides that follow are Crown's own public

3   statements that flatly contradict what Mr. Mayer is saying

4   here.  Crown is a public company traded on the NASDAQ.  It

5   makes periodic press releases and SEC filings.  And I know the

6   Court's familiar with those requirements.  In press release and

7   SEC filing, you know, one after another, Crown is saying we

8   worked in not only lead pipe inspection, but also remediation.

9          If you look at slide 9, it refers to that Element 82,

10  which is one subsidiary of Crown, will do the lead pipe

11  inspections.  PE Pipeline is another subsidiary, will focus on

12  lead pipe remediation.

13         The next slide has a headline -- this is from

14  January 29, 2025, after Mr. Mayer was hired, which has a

15  headline about Crown's Role in Lead Pipe Replacement

16  Initiative.

17         And if if you turn to slide 11, this is a public --

18  this is the investor presentation that I referenced where Crown

19  is describing to its investor its lines of business.  And one

20  entire slide is devoted to Crown's lead pipe replacement

21  business, not just inspections.  It's replacement as well.

22         If you -- on slide 13, these are SEC filings where

23  Crown has told the public and its investors that PE

24  Pipeline specializes in replacement of lead service lines and

25  that it's well positioned to do so.  This particular SEC filing

1  is an S-3 Registration Statement that was filed on January 14,

2  2025.

3          An important point -- I don't want to belabor this.

4  You can see what I'm pointing to.  But, importantly, this is a

5  public company that has been touting rehabilitation and

6  remediation services as being part of the portfolio of services

7  that it offers, including to municipalities.  There's been no

8  withdrawal of this statement, correction of this statement,

9  updating this statement --

10          THE COURT:  Do you know or do you have evidence that

11  they're actually engaged in remediation or -- remediation

12  projects at the moment?

13          MR. BEHRENS:  The only -- the evidence that we have

14  thus far, in addition to their public representations of what

15  they're doing, is they reported they were involved in three

16  different projects, one in Washington, D.C., one in Baltimore,

17  Maryland, and one in Medley, Florida, in the Miami area.  In

18  each case they said that they'd been retained to do services

19  including lead pipe remediation and rehabilitation.

20          So Mr. Mayer, in his declaration, denied -- or

21  suggested that, even though those announcements had been made,

22  that somehow Crown had withdrawn from those contracts, but,

23  again, these contracts were significant enough to Crown that it

24  made specific public reference to having secured these

25  agreements.  If they backed away from these agreements or they

1   had to back away from these agreements in order to hire

2   Mr. Mayer, you would have expected in a press release

3   announcing Mr. Mayer's hiring, but because of that, we're no

4   longer going to be doing these various lines of business.

5   Nothing like that occurred.

6          I will say -- if I turn Your Honor's attention to

7   slide 16 and 17, it does appear that overnight, between

8   yesterday and today, Crown has attempted some cleanup on this

9   issue.  So slide 16 is the website that -- this is what

10  appeared on Crown's website on February 18, two days ago.  And

11  it refers to PE Pipeline specializing in the replacement of the

12  lead service lines.  And Mr. Mayer files his declaration, and

13  the next day when you go to that page it says we can't find the

14  page anymore.  It's apparently an attempt to take down at least

15  in that one instance.

16          But, Your Honor, for today's purposes, we're here on

17  a TRO.  We have not had discovery.  The evidence amply

18  demonstrates, from Crown's own public statement, that it is

19  engaging in a public -- in a competitive business.  And

20  Mr. Mayer's denials, notwithstanding, don't hold up with

21  what -- the continuing public statements and, more importantly,

22  how Crown continues to hold itself out to the public as to what

23  services it's engaged in.  There's never been a public

24  statement, apart from Mr. Mayer's declaration yesterday, that

25  says, "We're no longer doing what we said we're going to be

1  doing."

2     So the second argument that Mr. Mayer makes, this is

3  on slide 18, he says that, "Okay.  Even if we do lead line or

4  we do do a competing business, the key difference in our

5  business is that we, Crown, are using a larger-diameter pipe

6  than PURIS is."  Well, there's a couple of responses to that.

7     First of all, if we go back to the definition of the

8  business that Mr. Mayer is not permitted to compete with, it

9  doesn't say you can engage in water and wastewater pipeline

10  projects of a certain diameter or not.  So that's not even --

11  it's a bit of a red herring to say, "Well, I'm doing it, but

12  I'm using a different-sized pipe."

13     In addition to that, flipping to the next slide, this

14  is a screenshot from MPC's website about the business it's

15  engaged in.  Mr. Mayer claimed in his declaration, as the

16  founder and former head of MPC, that MPC had never before in

17  its history used pipe that was greater than 54 inches in

18  diameter.  MPC is here saying between -- up to 78 inches.  This

19  isn't exclusive.  This is what we were able to find overnight.

20     So the last defense that Mr. Mayer has is, okay, even

21  if this is a directly competing business and it's -- you know,

22  notwithstanding all of the record I just went through, he

23  interprets restricted territory to be limited to a 50-mile

24  radius from his offices, the three offices that he occupied

25  during his tenure.  And for reasons we've already discussed, it

1    is just not a reasonable interpretation.  The language of --

2    the definition of restricted territory does not say, for good

3    reason, 50-mile radius from your office.  It says 50-mile

4    radius from the locations over which you had supervisory

5    authority.  In the context of this business, it has to mean the

6    50-mile radius of where the projects were located.  That's

7    where the competition has occurred.

8           So those are -- because those are really the only

9    issues that Mr. Mayer raises, there's no argument that this

10   isn't a valid noncompete agreement.  There's no argument that

11   it's too broad.  There's no argument that it's too long.

12   There's no argument that the proximity is unreasonable, nor

13   could there be.  Per the cases that we've cited to the Court,

14   this is well within the bounds of reason that other courts have

15   found to be valid restraints of trade.

16          Nor is there -- based on discussions of Ms. Purdy and

17   Mr. Maloney yesterday, my understanding is they don't have any

18   quarrel with a temporary restraining order that said, "You

19   can't solicit employees, either directly or indirectly."

20   They're claiming that he didn't do that.  We think -- we

21   respectfully say the record shows otherwise.  But there's no

22   quarrel that he's not allowed to do it.  I don't take them to

23   be objecting to that piece of it.  Nor do I take them to be

24   objecting to that he can't disclose or make use of confidential

25   information.  I don't think that there's any objection there.

1    So, really, where the dispute is today is whether

2  he's engaging in a competitive business or, more particularly,

3  whether he's joined a company and is facilitating and assisting

4  that company that does engage in a competing business.  The

5  record, as of this moment, all points one direction, other than

6  Mr. Mayer's denial.

7    THE COURT:  So before Mr. Mayer became the president

8  of this Crown division, would PURIS have considered Crown to be

9  a competitor?  In other words, is it the -- is it what

10 Mr. Mayer is bringing to it and is -- and what you understand

11 to be his wheelhouse that is making them a competitor of yours,

12 or were they already a competitor of yours before Mr. Mayer

13 went over there?

14   MR. BEHRENS:  I would say that, given the record that

15 I've shown, PE Pipeline, which at some point, I believe in

16 2024, Crown acquired, it was engaged in this lead line removal

17 and replacement business.  So in that sense, it was a

18 competitor.

19   But it becomes a whole different ball game when they

20 take the CEO and leader -- Mr. Mayer, there's no dispute, has a

21 great reputation.  This is part of why we spent 55 million

22 dollars for his business.  But Crown had some competing

23 businesses, it appears.  They had gotten some contracts that do

24 compete.  But what they announced in January was that Mr. Mayer

25 was being brought over to lead a new division of Crown called

1  Crown Construction.  And it would be engaging in businesses

2  that we've just described.  This would be a part of his

3  supervisory authority.  So what they're essentially saying is,

4  what you had at MPC, with that -- with all of his know-how,

5  expertise, contacts, etcetera, you now can have over at Crown.

6  In fact, the press release itself says -- the press release

7  says, Not only is he -- but he's looking forward to he and his

8  team, which his team would have been the team he had --

9        THE COURT:  Let's talk about that for just a second,

10  and then I'll probably give your opponents a chance.  What's

11  the actual evidence that Mr. Mayer has been raiding or

12  soliciting your employees?  I saw a reference to Ms. Romero, I

13  think.  And then Mr. Mayer said, "Well, Ms. Romero was fired by

14  your company, so we didn't raid her.  We just hired her after

15  you fired her."  There's some talk about other people.  What's

16  the actual evidence of all that?

17        MR. BEHRENS:  As of this moment, the evidence is that

18  a cease and desist letter went out on February 6th.  And on

19  February 7th the CEO began receiving reports that Mr. Mayer

20  and -- Lauren Romero happens to be a man, Mr. Romero.  I made

21  the same mistake with my colleague Lauren Purdy.  But between

22  the two of them, they had encouraged people to resign from

23  PURIS.  And in that same timeframe, two superintendents left

24  and a crew of up to 18 -- 18 crew members at various crews have

25  left already.

1    So, admittedly, it's a circumstantial case, but when

2  we sent the cease and desist letter, we didn't receive a

3  response that said, "Oh, you've made a mistake here."  We had

4  to go and file a lawsuit and seek a temporary restraining order

5  in order to protect our rights.

6          THE COURT:  All right.  Thank you, sir.

7          MR. BEHRENS:  Thank you.

8          THE COURT:  I may give you an opportunity to respond.

9  Let me hear from -- who's the one talking?

10         MR. MALONEY:  I will, Your Honor.

11         THE COURT:  All right.  Can I start with something on

12 my mind and then I'll let you --

13         MR. MALONEY:  Yes, sir.

14         THE COURT:  So I read in Mr. Mayer's affidavit that

15 he and PURIS were in disagreement about his continuation with

16 the company because he had health concerns, and so he was

17 trying to step back from being the president and take on an

18 advisory role and that they wanted him to stay as president.

19 Anyway, it was a disagreement.  I don't know when in point of

20 time all of that was occurring, but then they terminated him.

21 And I don't know exactly -- and I meant to ask.  I don't know

22 exactly what the reason was they decided to terminate him at

23 that point.  I guess they felt like he was asking for too much

24 money, I guess, is what I got out of it.

25         My question for you is, if Mr. Mayer was citing his

1    health as a reason that he wanted to step back from PURIS and

2    then they fire him on December 30th, and then three weeks later

3    he's now the president of this company that he's now going to

4    be charging forward to make good things happen, that struck me

5    as a little bit inconsistent.  And I'm wondering, you know, it

6    raises questions about whether he had pre-termination

7    discussions or did his health improve the moment that he was

8    terminated.  I'm just trying to understand the environment.

9              MR. MALONEY:  Yes, Your Honor.  And I don't have all

10   of the details.  But from my discussions, he was having heart

11   issues, like defibrillation or something to that effect.  That

12   was part of the mix.  Certainly part of the mix was also the

13   compensation.  And -- you know, that was definitely part of the

14   mix.

15             And I will say that I understand that, you know, his

16   heart issues did improve.  But I also think it's important that

17   he's -- you know, when he was at Murphy, or MPC, he was

18   responsible for that entire company, so to speak, which, again,

19   is different than PURIS, which we'll talk about when we talk

20   about locations, whereas here with Crown it's a division.

21   Right.  And so from my understanding, it's work.  He's going to

22   be working hard.  But it's not quite the same level of

23   responsibility, nor is his, you know, compensation as tied to

24   financials and improving the financials and the pressure of --

25   you know, PURIS is ultimately -- you know, I think is largely

1   held by private equity.  And there is a lot of go, go, go.  And

2   I think that was part of the mix, Your Honor.

3           THE COURT:  All right.  Go ahead, sir.

4           MR. MALONEY:  Thank you.  I do want to say, just at

5   the beginning, Your Honor, a couple of things.  One, we don't

6   agree that any TRO is appropriate.  We had discussions

7   yesterday in the context of, you know, maybe we could try to

8   work things out.  We didn't represent that.  And the reason

9   that a TRO is not appropriate, Your Honor, is that there's no

10   evidence that he has breached any of these obligations.  And

11   that's a fundamental aspect for a TRO.

12           At best, there is conflicting evidence, Your Honor.

13   And the conflicting evidence, I would respectfully suggest, can

14   only be resolved by Your Honor hearing from Mr. Mayer, hearing

15   from, you know, their witnesses, and not considering, you know,

16   hearsay that's in Mr. Fegan's affidavit about somebody told him

17   that they heard this or that or, you know, these printouts that

18   we got today for the first time from a website, again, that are

19   not in the record as part of the evidence for the Court's

20   consideration on the TRO.

21           And, also, if you look at most of those printouts and

22   the investor statements, they all do predate Mr. Mayer joining

23   Crown.  And so as we explain in his declaration and in our

24   brief, they specifically did their best to try to avoid

25   competing and so -- stop doing certain lines of business that

1    had previously been done once Mr. Mayer joined the company.

2          THE COURT:  So they were so anxious to have him that

3    they changed the way they did business just so he could be

4    there and not violate his noncompete?

5          MR. MALONEY:  Well, what they decided to do, Your

6    Honor -- yes, basically.  They focused on the three or four

7    areas that we talked about.  One is this trenchless lead

8    inspection using the proprietary technology, which I haven't

9    heard anybody say that the trenchless lead inspection is part

10   of -- what fits within the definition of pipeline

11   rehabilitation, which is what the noncompete is actually

12   limited to.  So the focus on that and then focus also on these

13   large diameter pipes, again, that we believe are larger than

14   what Murphy did.

15         And also, Your Honor, importantly -- and this kind of

16   got blown over, they're not doing that for municipalities, that

17   large diameter pipe.  So even if, you know, PURIS or Murphy is

18   doing larger diameter pipes, we're not doing it for

19   municipalities.  And the agreement says -- it limits it to work

20   for municipalities.  So we're working for the federal

21   government or we're working for oil and gas companies.  That's

22   not violative of the noncompete, Your Honor.

23         And then the other aspect is the FEMA work, you know,

24   which he's going out and working on trying to do, you know,

25   disaster recovery following the fires.  And I don't think

1   anybody is arguing that that aspect of the work he's doing

2   violates or fits within the noncompetition provision of the

3   agreement.

4          I think a good analogy, Your Honor, too is, when you

5   think about this sort of, you know, lead inspection and then

6   the lead removal, the lead inspection is really kind of like a

7   radiologist, you know, that uses radiology equipment to

8   determine if somebody may have cancer or some other thing.  And

9   then a surgeon then uses that information from the radiologist

10  and, you know, goes in surgery and takes out the tumor.  I

11  don't think anybody would argue that a radiologist is competing

12  with the surgeon.  It's just two different fields.  And that's

13  exactly what we have here.

14         THE COURT:  Well, if you read the public releases and

15  you look at the website, I guess until yesterday, you know,

16  it's -- I mean, it's hard not to read it and think that they're

17  doing what they're saying they're not doing.  And that's what

18  I'm -- I mean, is it -- I guess it just seems a little unusual

19  that a company would want somebody there so badly that they

20  would say, "Okay.  We're not going to do that business

21  anymore," or -- are you saying they never did it, or are you

22  saying that they decided not to do it when they hired

23  Mr. Mayer?

24         MR. MALONEY:  It's the latter.  And I don't know that

25  that aspect of the business -- again, it's limited to

1    trenchless pipe rehabilitation for municipalities.  Right.  So

2    it's a pretty limited scope of business.  I don't know exactly

3    how much that was of their business.  They did do some of that

4    work.  They did make the conscious decision to hire Mr. Mayer.

5    And part of it -- I mean, they reference it, he has a

6    reputation in this field and he's a -- you know, can help their

7    business a lot.  But during the term of the noncompete, they've

8    made an effort to drop that piece where they're doing rehab and

9    only focus on the inspection and then only work on areas that

10   aren't for municipalities or that don't violate the noncompete,

11   Your Honor.

12          And I think the other issue on the noncompete -- and

13   I think you touched on it a little bit is, it's not every place

14   they ever had a project.  If you actually read the terms of the

15   noncompete, I mean, it's pretty straightforward that it says,

16   "Locations."  It doesn't say, you know, where we have projects

17   or where we bid projects.

18          Another thing, Your Honor, if you look at the handout

19   we got today, it shows all those locations on the map.  You

20   know, what I heard Mr. Behrens say is, those are all the

21   locations where PURIS ever did work.  Well, Mr. Mayer, you

22   know, while he was employed by PURIS, in the sense that Murphy

23   was owned by PURIS, he wasn't working in all of those

24   locations, Your Honor.  PURIS has many, many other divisions.

25   And the only locations he was working in were the Jacksonville,

1    the Detroit, and the Pembroke Pines locations, Your Honor.

2           And so, you know, they may think, well, it's not fair

3    that it's written that way.  Well, Your Honor, they wrote it.

4    And if they wanted it to be every location they had on a

5    project or where they bid on a project, they could have used

6    those terms, and they didn't.  I mean, it says, "Company

7    locations."  I mean, just plain reading of the document, it

8    refers to locations of the company.  And as we've established,

9    Your Honor, he's only worked at three.  And even if you took it

10   broader than that, the whole entire company only has 16.  And

11   so to say that, you know, they compete all over the nation

12   because they bid on a project or they did a project at some

13   point in time, it's just not in line with what the actual

14   noncompete agreement says.

15          You know, the investor presentation, we only had two

16   that they attached to the declaration so we haven't had a

17   chance to even review what they've provided here.  Again, I

18   would object that any of this be considered part of the record.

19   This is lawyer argument in a PowerPoint that we got at the

20   hearing.

21          But even if you look at that, most of it is --

22   predates Mr. Mayer joining Crown.  And, again, the evidence,

23   the actual evidence, in the record and the sworn testimony of

24   Mr. Mayer is that they decided to take that part of the

25   business out and focus on other areas that were not in

1    competition with what the agreement provides.

2         We talked about the pipe -- the large pipeline.

3    Again, the only evidence in the record is that Crown only does

4    that for the federal government and private institutions, not

5    for municipalities.  So if it's not for municipalities, it

6    doesn't matter what it is, because, you know, it has to be a

7    municipalities under the language of the noncompete.

8         We've talked about the FEMA work.  We've talked about

9    the territory, Your Honor.  You know, if it said -- again, if

10   it said 50 miles of everywhere they worked, they could put that

11   in there, Your Honor.  And he certainly only worked at those

12   three, and he had no responsibility for any of the PURIS

13   division other than the Murphy division.  And, again, he stated

14   under oath that he's not working on any customer accounts of

15   specific customers, and the language uses specific customers.

16   It doesn't talk about prospects or, you know, areas in markets

17   they're trying to get into.  It talks about specific customers,

18   and he's sworn that he's not doing that or doesn't intend to do

19   that.

20        And then with respect to the non-solicitation

21   provision, Your Honor, again, I think Your Honor kind of

22   recognized, they don't really have any proof there.  There's no

23   there there.  They've got basically -- they've identified some

24   unnamed people that they think may have left because they

25   think, you know, he may have asked somebody to contact

somebody.  They've got hearsay from Mr. Fegan about somebody

told him that they heard that somebody called.  Your Honor,

that's not evidence in the record obviously.  It's just pure

speculation and it's hearsay.  And it's been rebutted by

Mr. Mayer's affidavit -- or his declaration.

And, again, with respect to Mr. Romero, I mean, if

he's fired by the company -- I didn't hear them deny that he

was fired, he's fair game.  Because the non-solicitation says

we can only -- he can only not solicit somebody to leave their

employment with PURIS and come to Crown.  If he's fired, he's

already gone.  And so that wouldn't be a violation.  So there's

really -- there's no evidence in the record, much less to meet

the high burden on the TRO, to establish that he violated --

THE COURT:  What was Mr. Romero's job?  What was his

position with your client?

MR. MALONEY:  Currently?

THE COURT:  Not -- with the -- no.  Before.  That's

right.  I got the wrong side.

What did -- what was he hired to do for your client?

MR. MALONEY:  For Crown?

THE COURT:  Yes.

MR. MALONEY:  He's working with Mr. Mayer in that

same division.  Again, Your Honor, like I said, there's just no

evidence to support that.  It's pure speculation.  You know,

we're here on a TRO.  I mean, that's an extraordinary remedy

1    that requires extraordinary relief.  And, you know, they just

2    haven't met the burden as to that non-solicitation or any of

3    the other aspects.

4          And then -- we didn't talk about this as much, about

5    the confidentiality.  But there's been no evidence, but pure

6    speculation, that he's violated any of the confidentiality

7    provisions.  You know, essentially what they're trying to

8    argue, Your Honor, is this unlimited confidentiality provision,

9    that that somehow prevents him from ever working with Crown

10   unlimited in time.  They're essentially sort of trying to

11   bootstrap the confidentiality provision into a noncompete,

12   which they didn't bargain for.

13         The noncompete is very limited.  It's, you know,

14   trenchless pipe rehabilitation for municipalities.  Crown's not

15   doing that work.  Just because he has things in his mind -- he

16   unavoidably had some experience while working for Murphy at

17   PURIS.  That doesn't mean he's using that to compete.  And

18   there's no evidence that he has.

19         And the sole case they've cited for this proposition,

20   Your Honor, this Lincare case where it -- the judge found that

21   there was irreparable harm shown by, you know, an executive

22   going to a competitor.  The Court really focused on the fact

23   that it was a direct competitor.  Again, our position, and

24   based on the plain language of the documents, it's just not a

25   direct competitor because they're not doing that type of work,

1  again, based on the evidence on the record before Your Honor at

2  this time.

3          I do want to briefly address the declaration that was

4  filed yesterday afternoon from the chief -- I believe the chief

5  information officer for PURIS.  And if you look at that, Your

6  Honor, all that says is that he believes that those computers

7  were factory reset on December 27, 2024, causing deletion of

8  the data.  It does not say that my client was the one that did

9  that.  If they had some evidence of that, you would think that

10 would be in the declaration.

11         Also, Your Honor, obviously we didn't have time to

12 respond to that declaration, but I will tell you that -- you

13 know, when we do discovery and we come back for a preliminary

14 injunction hearing, my client actually left the office on

15 December 19th, left his computers there, went on a trip.  He

16 has a property in Utah, went to Utah, was in Utah the entire

17 time where the negotiations were going on by phone, was fired

18 by phone on December 30th and never -- between December 19th,

19 ever -- he's never gone back to the office, never had

20 possession of those computers.  So he did not have possession

21 of them on December 27th, and so did not and could not have --

22 you know, whatever the factory reset, to delete any data on the

23 computers as alleged in that declaration.

24         Again --

25         THE COURT:  When we get into discovery, are -- what

1  are we going to learn about whether your client had discussions

2  with Crown before he was terminated?

3          MR. MALONEY:  I don't know, Your Honor.  I don't know

4  the answer to that.  We're about to do discovery.  That's --

5  obviously, Your Honor, that's what discovery is for.  I think

6  it's important, and Your Honor knows this, we don't have any

7  discovery.  We were engaged in this case on Monday, Your Honor.

8  And so -- but we have, you know, put together a declaration,

9  sworn evidence and testimony, rebutting each of the allegations

10  that have been alleged.

11          And, again, a lot of the allegations are really based

12  on sort of flimsy supposition and not speculation, and not

13  sufficient to grant a TRO at this stage, Your Honor.  You know,

14  they have to show irreparable harm.  They haven't shown that.

15  They haven't identified one specific customer of theirs that

16  they say is being taken.  They haven't identified one actual

17  named employee that they believe has been solicited.  They

18  haven't identified one item of confidential information that,

19  you know, they claim Mr. Mayer has disclosed or taken with him.

20  There's just nothing there there, Your Honor, for irreparable

21  harm at this point to justify a TRO.  And they haven't

22  demonstrated that the injury that they claim, sort of

23  speculative injury, is going to outweigh stopping Mr. Mayer

24  from working for Crown entirely on a TRO based on this record,

25  Your Honor.  You know, stopping somebody from working entirely

1  without proving a breach or even establishing a breach, a

2  reasonable likelihood of success -- substantial likelihood of

3  success on the merits is not in the public interest, Your

4  Honor.

5        So, again, just to sum up, extremely high burden.

6  The record before Your Honor, at a minimum, is rebutted

7  factually.  And so what we would ask, Your Honor, is that the

8  Court deny the TRO at this time and schedule a preliminary

9  injunction hearing within a reasonable time -- we suggest

10  60 days -- allow the parties to engage in discovery, and then

11  allow the Court to hear from these individuals, judge their

12  credibility, hear the testimony, everybody have all of the

13  documents, bring them into evidence, versus, kind of, you know,

14  last-minute press releases and things being handed out at a

15  hearing that just are not part of the record.

16        I don't have anything further, Your Honor, unless you

17  have any questions.

18        THE COURT:  Thank you.

19        MR. MALONEY:  Thank you.

20        THE COURT:  Mr. Behrens, since you're the movant, I

21  will give you a brief period of rebuttal if you want to use it.

22        MR. BEHRENS:  Thank you, Your Honor.  Just a couple

23  of points.  First of all, on confidential information, the

24  evidence we have before the Court right now is that Mr. Mayer

25  acknowledges that he was required to turn in all devices on

1  which he had company information.  He only turned in a desktop

2  and a laptop.  According to what my opposing counsel is saying,

3  someone apparently did it for him.  But in an unusual

4  circumstance, everything was wiped from that.  Now, this is a

5  person whose technical experience was important to the company.

6  The fact that he would delete all of his own information, or if

7  he didn't do it, somehow that happened to intersect within four

8  days of his departure of the company, is at least cause for

9  concern.

10         We also have, in the last 24 hours, Crown tried to

11  cover its tracks by taking something off of its website which

12  had been cited in evidence and was contradictory to the

13  declaration Mr. Mayer put in.  That tells us something about

14  the need to make sure that none of the confidential information

15  finds its way into the wrong hands.

16         Your Honor, you've asked a couple of times whether

17  there was concern about pre-termination conduct.  We've not

18  gotten into that.  We didn't think it was relevant to the

19  proceedings today.  But if that is relevant to the Court's

20  consideration of the TRO, we would be happy to put in a

21  supplemental declaration.

22         The fact of these -- Mr. Mayer had made demands, that

23  he and his team receive tens of millions of dollars or he would

24  leave the company and he wanted to be released from his

25  noncompete.  There was concern because of his association with

1   other individuals, including the current president of Crown's

2   business, PE Pipelines, which coincidentally was a business

3   that, when it was first constructed, listed Mr. Mayer's home

4   address as its business.  That's the business that Crown now

5   owns.  And it is the business that Crown has represented does

6   the rehabilitation services.  Remember, there are two

7   subsidiaries that Crown has cited.  Element 82 does the

8   inspection services.  PE Pipeline does the remediation removal.

9   The genesis of that business was a business that was

10  incorporated using Mr. Mayer's home address as the place of

11  business.

12          So I will say there are -- there was significant

13  concern that Mr. Mayer was going to hurt PURIS's business.  And

14  that played into the reasons -- the reasons why he was

15  terminated and why he was reminded in the letter that -- you

16  can see -- Your Honor, we've submitted the letter that he was

17  given on his departure -- it was not a nice letter, it was

18  reminding him of all of the things he was required to do.  And

19  the not-so-subtle suggestion was that we were concerned he was

20  going to violate the noncompete agreement and his obligations.

21  And then three weeks later he did.

22          So for those reasons, Your Honor, we would ask for a

23  TRO to observe the sit-out period which we -- which Mr. Mayer

24  negotiated and agreed to, that he would not go and compete with

25  another company that does PURIS's business.  That's what he

1  did.  There's no harm to him to have to sit out, as he agreed.

2  And the harm to PURIS is irreparable if he's allowed to

3  continue.

4          Thank you, Your Honor.

5          THE COURT:  Thank you.  All right.  I'm going to take

6  a recess and confer with my legal counsel over here.  And then

7  I'll come back out and see where we are.  Okay?

8          COURT SECURITY OFFICER:  All rise.

9      (Brief recess from 11:53 a.m. to 11:56 a.m.)

10         COURT SECURITY OFFICER:  All rise.  The Court's back

11 in session.  Please be seated.

12         THE COURT:  Did you-all settle?

13     (Negative response.)

14         THE COURT:  All right.  So here's where we are, we

15 are here on a motion for a temporary restraining order, and

16 that's the hardest thing there is to get.  It's got its place

17 and it's, you know, available.  I -- I have granted TROs, of

18 course, in certain situations.  But in these situations, I have

19 found that it's much better usually if I can get a lawyer on

20 the other side and that we, at least, have some adversarial

21 testing of the motion.  And I'm glad and appreciate everybody

22 working hard to make that happen on short notice.  I wanted to

23 give an early hearing, because it is a TRO request and I wanted

24 to, at least, make sure that I gave the plaintiff an

25 opportunity to demonstrate the entitlement to it.

1    And the standards really are the same for preliminary

2  injunction, but the TRO is even a heightened standard in order

3  to get it, plus it can be without notice but, of course, that's

4  not what we did in this case.

5    And so the first factor that I look at is substantial

6  likelihood of success on the merits without even getting to the

7  others.  And what I would say is, what I've heard -- what I've

8  read and what I've heard today leads me to say it seems like

9  there's some smoke here, but whether there's any fire or not, I

10  just don't know.  And I am not prepared to find, on this very

11  bare record so far, a substantial likelihood of success on the

12  merits.  That does not mean I won't find it.

13    And as I said, I think some of the timing and the

14  activities of Mr. Mayer, some of the activities at least --

15  and, again, Mr. Maloney's right, obviously we need to nail this

16  stuff down.  But some of the activities of Crown, you know, do

17  give me pause in terms of whether Mr. Mayer is competing, as he

18  shouldn't be, or whether efforts have been made to kind of try

19  to work around the noncompete.  And whether it's been

20  successfully done or not, I just don't think we know.

21    And so I really have to be -- on a TRO, I really have

22  to be kind of really persuaded that -- there's just, kind of,

23  only one way to look at this, and I'm just not there.  As I

24  said, I feel like there's smoke, but we'll see if there's fire.

25    And so I'm going to be denying the motion for

1　temporary restraining order and positioning us to get to a

2　preliminary injunction hearing.  I do think some discovery will

3　be appropriate.  And I know that the plaintiffs have suggested

4　some specific discovery, which is something I'm going to be

5　considering in a moment.  And I'm just going to kind of lay all

6　of this out there.  We're going to agree on what the limited

7　expedited discovery will be.

8　　　　Understanding that the plaintiff feels like there's

9　some urgency to this matter, I don't think I can treat it as an

10　emergency.  And I think it has to be -- I think we ought to

11　proceed at pace, but I don't think we're going to run around

12　like chickens with our heads cut off.

13　　　　So I'm -- I can do one of two things.  I looked at my

14　schedule and I also looked at what would be a reasonable amount

15　of time to accomplish this so that people aren't having to run

16　around with their hair on fire.  And so I actually have two

17　trials in March.  I don't know how that happened.  I'm supposed

18　to be a senior judge.  I have two trials in March and a

19　preliminary injunction.  I'm not sure how this -- my senior

20　status is working out so far.

21　　　　Anyway, what I'm looking at is, I could do it the

22　week of March 17th -- hold on one second.

23　　　(Judge confers with courtroom deputy off the record.)

24　　　　THE COURT:  So I'm looking at Tuesday, March 18th, as

25　a possible day for a hearing.  If we didn't do it, if that's

1  too soon or if you think you need more time, then we'd probably

2  be looking at the beginning of April, something like that.  But

3  probably the week --

4      (Judge confers with courtroom deputy off the record.)

5          THE COURT:  I had a criminal trial that first week in

6  April, but it's gone now.  So that actually is a pretty good

7  week for me.  I have some things earlier in the week, but we

8  could probably do it either the 3rd or 4th of April would be

9  another possibility, probably the 3rd, Thursday.  So those are

10 my -- that's my thinking in terms of timing.

11         In terms of discovery, I'm willing to hear from both

12 parties as to what they think they need in order to have a

13 hearing.  I don't typically actually have an evidentiary

14 hearing where people testify live.  I have done it, and I did

15 it recently and I'm not unalterably opposed to it.  So I think

16 what we would do is, you-all would take your discovery and then

17 let me know whether you really feel like it would be better to

18 have me hear from these folks.  I'm willing to do it if it

19 makes sense.  As I said, that's not normally the way we do it,

20 but sometimes it does make sense.

21         So what I'll need to hear from the plaintiff first is

22 what they think about timing, whether -- of course, I can do it

23 later too.  I'm not -- I mean, if you feel like it's going to

24 take longer to do all of this stuff that you need to do -- I

25 want it to be a meaningful hearing.  We're not going to do it

1  unless it's meaningful.  If we have to push it out even

2  further -- I was trying to be respectful of the plaintiff's

3  desire to have a ruling on a motion for preliminary injunction.

4  That's why I'm offering the dates that I'm offering.  So I need

5  to hear from you on scheduling and I need to hear from you

6  specifically on what discovery you're requesting.  I know it is

7  in your papers here.  If this is what you're asking for, we can

8  deal with that.  And then I will hear from Mr. Maloney.

9           Ms. Purdy?

10          MS. PURDY:  Good afternoon again, Judge Corrigan.

11          THE COURT:  Good afternoon.

12          MS. PURDY:  To try to make this as productive as

13  possible, fortunately we were able to talk with Mr. Maloney

14  ahead of the hearing to at least start the conversation of what

15  we needed.  We've identified four people that we think we would

16  like to depose.  I know they're still thinking about it, but

17  they mentioned at least two on their side.  So obviously

18  Mr. Mayer.  We'd like to do a 30(b)(6) for Crown, of course.

19  Lauren Romero and David Kinsella, which is the person that's

20  the president of PE Pipeline, who you heard Mr. Behrens discuss

21  earlier.  And then so far, understanding they're still thinking

22  about it, Mr. Maloney mentioned Mick Fegan, who is the CEO, who

23  was one of the declarants, and Jeff Johnson, the chief

24  information officer.  That is kind of the deposition piece of

25  it.

1    I want to talk just very briefly about forensic
2 discovery.  So there's two devices that we have in our
3 possession that we're still doing additional investigation and
4 inspection of.  We actually hope to get an update tomorrow on
5 reports and other information about what may have been
6 extracted, if any hard drives were inserted and when that
7 happened.
8    There's at least one other device that we are very,
9 very interested in getting forensically imaged.  And that is
10 Mr. Mayer's personal cell phone.  He wasn't issued a work
11 phone, so he didn't turn in a phone.  So we're interested in at
12 least getting a forensic image so we can determine, once we get
13 a little more information, about devices we have, about whether
14 any data or information, confidential proprietary information,
15 is on Mr. Mayer's phone.  And then obviously that's a key piece
16 of evidence with respect to his communications with Crown
17 before his termination and any communications with customers or
18 employees of PURIS or Murphy.  So there's that piece.
19    We started discussing that.  Obviously they're
20 getting ready for this hearing.  We're all getting ready.  We
21 haven't completed the discussions.  But we offered up, as a
22 possible, sort of, expedited solution with everyone's privacy
23 interest in mind to agree on a neutral examiner.  Our office
24 has already reached out to two potential experts for that.  We
25 are still in discussions.  So that's one piece of that.

1        And then on the document piece, it is basically

2  what's referenced in our motion, Judge Corrigan.  The key

3  issues, obviously, communications with Crown, communications

4  with our customers, communications with Mr. Kinsella and

5  Mr. Romero, basically the documents you would expect us to ask

6  for on soliciting our customers, soliciting our people,

7  using -- or transferring our confidential information,

8  documents about Mr. Murphy's [verbatim] employment with Crown.

9        And then one piece that isn't directed to Mr. Mayer

10  himself, but that we have ready to go as soon as the hearing is

11  over, are documents relating -- documents that we'll be

12  requesting from Crown itself as a relevant nonparty to this

13  action.  We started to talk about that.  I think there was sort

14  of a general understanding of what we were requesting and why.

15  But, of course, we haven't had a chance yet to talk to

16  counsel for Mr. Mayer about things like search terms and

17  precisely what they think of our request.  We did send them a

18  draft set of RFPs with dates and whatnot that I know they were

19  still reviewing before the hearing.

20        THE COURT:  Stay right there.

21        Mr. Maloney, you represent Mr. Mayer?

22        MR. MALONEY:  Yes, sir.

23        THE COURT:  You don't represent Crown?

24        MR. MALONEY:  That's right.

25        THE COURT:  Does Crown a have a lawyer in this matter

1  or not?

2      MR. MALONEY:  They have a lawyer that got us

3  involved.  He's in New York.

4      THE COURT:  What's his name?

5      MR. MALONEY:  Jeff Zuckerberg.

6      MR. YORK:  Josh.

7      MR. MALONEY:  Josh.  Sorry, it's Josh Zuckerberg.

8      THE COURT:  Jeff Zuckerberg is Facebook or something.

9      But you have the ability to communicate?

10     MR. MALONEY:  Yes, sir.

11     THE COURT:  Okay.  Ms. Purdy, what were you thinking

12 about in terms of timing?  As I said, I'm -- of course, I'm

13 willing to do it later, but I'm trying to be respectful of at

14 least giving you some type of expedition here.  So what is

15 your -- what kind of timeframe are you looking at?

16     MS. PURDY:  We were just discussing that before I

17 walked up to the podium, Judge Corrigan.  And we do want as

18 soon as reasonably possible for the reasons that you've already

19 identified.  We really just need to check our calendars between

20 the dates that you gave us.  But somewhere between that

21 timeframe that works for the Court and that works on our

22 schedule.  We would rather move more quickly than more slowly.

23     THE COURT:  Okay.  All right.  Thank you, ma'am.

24     Mr. Maloney, first of all, Ms. Purdy has identified

25 some specific discovery and specific deponents.  Do you have

1  any objection to any of the things that she's talking about on

2  her side first?  And then we will talk about what you want to

3  do.

4         MR. MALONEY:  Yes, sir, Your Honor.  As far as our

5  client, of course, no objection.  The 30(b)(6), you know, they

6  can do that with Crown, same with Mr. Romero and Mr. Kinsella.

7  So we don't really have any objection to any of that.

8         The forensic discovery stuff, particularly as it

9  relates to my client's personal cell phone, we've got to talk

10 about that.  Because, as you know, Your Honor, everybody knows,

11 there is a -- everybody has sensitive personal information on

12 their cell phone.  And I don't want a situation where they're

13 getting to look at an entire image of the cell phone.  Maybe

14 there is some way we can do that with the special examiner.  We

15 touched on that for two minutes yesterday.  I can't consent to

16 that, Your Honor, as I sit here.  I recognize, you know, that

17 they may have some right to get something off the phone.  But

18 an entire image does concern me.

19        THE COURT:  I don't know --

20        MR. MALONEY:  I think timing there too is an issue.

21        THE COURT:  I don't know -- the world we live in now,

22 I don't know what the norm is really, I really don't.

23 Obviously if a cell phone is provided by the company, that's

24 one thing.  But if it's your own personal phone -- so I'm very

25 hopeful you-all can work something out that makes sense,

1   because I -- I may have to give it to Judge Barksdale if you
2   can't.
3           All right.  And the scope of the paper discovery --
4   it may not be paper.  But the scope of the documents is --
5   seemed within the ballpark?
6           MR. MALONEY:  Yes, the high level.  There may be
7   things around the edges.
8           THE COURT:  Sure.  Well, I know you and Ms. Purdy can
9   work through some things.  So that will be good.
10          MR. MALONEY:  There are a couple -- sorry.
11          THE COURT:  All right.  Go ahead.
12          MR. MALONEY:  I was going to say, did you want me to
13  talk about what discovery we want?
14          THE COURT:  Yes.
15          MR. MALONEY:  She did mention the declarant,
16  Mr. Fegan, Jeff Johnson, the 30(b)(6) of PURIS, and maybe
17  MurpCo.  I think we're going to be interested in the people
18  that negotiated the noncompete and what was intended by those
19  terms.  There may be others.  And, frankly, Your Honor, I
20  haven't had time to really think about it.  I think at a
21  minimum that.
22          I think one issue that I don't know that's been
23  addressed, but there may be a need for some expert testimony,
24  Your Honor, as to the difference in these markets, you know,
25  somebody that could talk about, are these the same thing,

1  trenchless inspection and trenchless rehabilitation, or are

2  these separate in the industry and considered separate in the

3  industry.  If they are going to concede that point, that those

4  are totally different, that's one thing.  But if we're going to

5  be fighting about that, we may need a third-party expert

6  involved potentially in that issue.

7          That and the issue with the cell phone makes me think

8  we need a little bit more time.  And then I also have a

9  personal issue with one of the dates that Your Honor mentioned.

10          THE COURT:  Okay.  Which date?

11          MR. MALONEY:  The March 18th date.  I'm going to be

12  out of the country.

13          THE COURT:  That's fine.

14          MR. MALONEY:  Not on the 18th.  I come back on the

15  16th, late.

16          THE COURT:  That's fine.  We'll -- that's probably a

17  little ambitious anyway.

18          MR. MALONEY:  We probably prefer to have it towards

19  the end of April, but. . .

20          THE COURT:  If you-all are really talking about

21  deposing all these people, you may want to consider -- you may

22  want to consider putting a time limit on these depositions that

23  are -- I think the federal rules say seven hours or something.

24  I think you may want to consider putting a time limit on these

25  depositions.

1    Ms. Purdy, I think the March date was probably
2  ambitious.  The early April date may still be ambitious.  I
3  don't know.  I can offer another -- let me see what I can do
4  here.  Instead -- I think I suggested April 3rd.  I can offer
5  April 22nd, which would be basically 60 days from now, which
6  might be -- I know your client's, I'm sure, anxious, but if
7  you're talking about actually deposing seven or so people and
8  you're talking about figuring out the cell phone and you're
9  talking about figuring out document production with each other,
10  that may be more realistic.  But I'll hear from you

11    MS. PURDY:  If it's okay with you, I'll just -- Judge
12  Corrigan, it's possible that would work, but I think we just
13  need to look at our calendars and see -- again, earlier is
14  better, but we hear what you're saying and it may be that that
15  date is a little more realistic.  But we just need to --

16    THE COURT:  Here is what I'm going to instruct
17  you-all to do.  Because -- and I appreciate the
18  professionalism.  And I know -- you know, you won't agree on
19  the case, but you can agree on working with each other.  And,
20  you know, I think this is a significant matter.  I do think
21  that the plaintiffs have shown me that there may be something
22  to the case, and now we just need to find out whether there is
23  really something to the case.  And I also have in mind that the
24  preliminary injunction hearing and decision could effectively
25  be the case.  So I have all of that in mind.

1         And so I think balancing all of that, I'm thinking

2  probably the later part of April is a better time.  If that

3  particular date that I gave you, the 22nd, isn't available, I

4  can work with you on another late April date.  I'm looking at

5  the next week, which looks pretty good.

6         So here is what I would like you-all to do.  I would

7  like you-all to discuss, between counsel, a recommended date

8  for the hearing.  That would be April 22nd or probably

9  thereafter.  If -- I will listen to the plaintiff if they

10  really insist on going earlier, but I'm really thinking that

11  may be it, and work out the discovery details about when you're

12  going to propound it and when it's got to be responded to, work

13  out the deposition schedule and then file a joint report with

14  me that tells me what the play is.  Okay?

15         And the only question I have is, should I give you a

16  deadline by which to file that joint report so everybody is at

17  least working to get that done?  Would, for example, a week's

18  time be good?

19         MS. PURDY:  That works, I think, for us.

20         MR. MALONEY:  If we could do next Friday, Your Honor,

21  that would be. . .

22         THE COURT:  That's fine.  So next Friday is

23  February 28th.  So on February 28th I'm expecting a joint

24  filing from the parties that kind of lay it out for me.  I will

25  hold on to the issue of whether the hearing will be with live

1  testimony or not.  I'm holding that as a possibility.  So I'm

2  going to reserve an entire day, whatever day we pick.  I'm not

3  committing to that, but I'm holding that open as a possibility.

4  And as you-all get into it, you can probably tell me whether it

5  needs to be or not -- should be or not.  If you can lay it out

6  for me, depositions, discovery, and what you're going to work

7  for on the cell phone.

8         I'm not sure about the need for an expert,

9  Mr. Maloney.  Maybe.  But I don't want that to end up making

10  the thing go out further or whatever.  You know, I'm not

11  necessarily saying no, but I'm not going to probably hold us up

12  too long on that issue.  Just keep that in mind.  Okay?

13         All right.  So what you're going to get from me today

14  is a brief order that says for the reasons stated on the

15  record, the motion for a temporary restraining order is denied.

16  No later than -- on February 28th, the parties will file a

17  joint statement of how the case should proceed to the motion

18  for preliminary injunction.  That is all you will get from me.

19         Is there anything else -- by the way, there is

20  absolutely nothing wrong with trying to work this out.  And I

21  don't exactly know what that would look like.  But these are

22  two sophisticated businesses.  Mr. Mayer seems like a

23  sophisticated person.  Nobody can be sure of how these things

24  turn out.  You really cannot.  Just because I denied the TRO

25  today doesn't mean I'm not going to grant a PI.  And I'm

1　completely open on that.  I really just want to have evidence

2　that I can hold on to that really tells me where I need to go.

3　　　　You know, I don't enjoy enjoining somebody from

4　making a living or having a job, but I've done it before and I

5　will do it again if I have to, you know, because the company

6　has rights and the agreement was signed.  Mr. Mayer, I'm sure,

7　is a sophisticated person, and he decided to sign that

8　agreement.  Apparently there was an extension of it to 18

9　months at some point, so there was some discussion of it.  And

10　at least according to the plaintiff, there was discussion by

11　Mr. Mayer in the negotiations as to whether he was going to

12　stay on or not regarding his noncompete.  So everybody knew the

13　noncompete was in the mix.

14　　　　So if there is a way forward that you-all could come

15　up with a business solution that would work, you're going to be

16　much better off than getting a ruling from me.  Because my

17　ruling is either going to be grant it or deny.  So I would

18　encourage you to do that.

19　　　　I would also encourage you that, if you feel that

20　some mediated resolution makes sense, that you identify a

21　mediator that you have confidence in and that you give that a

22　shot too.  So I'm not going to impose that on you, but I'm

23　going to suggest to you -- maybe strongly suggest to you that

24　that ought to be part of the discussions you're having as well.

25　All right?

1          MR. BEHRENS:  Thank you, Your Honor.

2          THE COURT:  All right.  Is there anything else from

3    the plaintiff today?

4          MS. PURDY:  Just one question, Judge Corrigan.

5          THE COURT:  Sure.

6          MS. PURDY:  Once we confer on a date, do you want us

7    to just contact chambers, or do you want us to put that in the

8    joint report?

9          THE COURT:  You can put it in the joint report.  But

10   if you have it sooner rather than later and you know what it

11   is, you can just call Tim and give it to him.  That way we'll

12   block that date out.  But also put it in the report.  Yes, if

13   you come up with a date -- and I didn't give you every date

14   that might be available.  So it may be that you come up with a

15   date and you can call Tim and make sure that we can accommodate

16   that.

17          I'm looking -- to be helpful, I've offered you

18   April 22nd.  I likely could do April 24th.  In the next week we

19   had a trial that went away, and so that's not a bad week, that

20   week of April 28th.  I've got motion hearings on the 30th, so I

21   probably wouldn't do it on Wednesday.  But that week looks

22   pretty good.  So those are options.  Okay?

23          All right.  Mr. Maloney, anything else from you?

24          MR. MALONEY:  No, sir, Your Honor.

25          THE COURT:  Good to see everybody.

1          THE COURTROOM SECURITY OFFICER:  All rise.

2          (Proceedings concluded at 12:26 p.m.)

3                              - - -

4

5                          CERTIFICATE

6

7

8    UNITED STATES DISTRICT COURT    )

9                                    )

10   MIDDLE DISTRICT OF FLORIDA       )

11

12

13

14        I hereby certify that the foregoing transcript is a true

15   and correct computer-aided transcription of my stenotype notes

16   taken at the time and place indicated herein.

17

18        DATED this 21st day of February, 2025.

19

20

21               s/Heather N. Randall_____
                 Heather Randall, RPR