UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| PURIS LLC,<br><br>    *Plaintiff*,<br><br>v.<br><br>ANDREW J. MAYER,<br><br>    *Defendant*. | Case No. 3:25-cv-00157-TJC-PDB |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO CANCEL
THE PRELIMINARY INJUNCTION HEARING
AND RELATED EXPEDITED DISCOVERY SCHEDULE**

**[REDACTED VERSION]**[1]

---

[1] All supporting exhibits, including portions thereof quoted within this brief, have been designated in full as "Confidential" by Mayer's counsel pursuant to the Amended Stipulation and Protective Order in this action (ECF 33). Pursuant to that order and Local Rule 1.11, undersigned counsel reached out to Mayer's counsel shortly before filing to confer on whether Mayer contends these documents should be filed under seal (which PURIS does not). Because the parties still have not yet conferred, out of an abundance of caution PURIS is proceeding to file this Opposition in redacted form and tomorrow, depending on outcome of the conferral, PURIS will either file its Opposition in unredacted form or will file a motion to seal.

## I. Introduction

After denying for months that he was violating his Agreement Not to Compete with PURIS, Mayer abruptly resigned his position as President of Crown's Construction Division earlier this week, just as he and Crown were due to produce the bulk of their documents and just prior to their scheduled depositions. This sudden resignation is not surprising: the very few documents produced thus far already show that Mayer misled the Court in his prior declaration to fend off the temporary restraining order and that he has been engaged in an orchestrated campaign (dating back to before he left PURIS) to—in Mayer's words—usher in PURIS's "downfall" by destroying Murphy Pipeline Contractors, LLC ("MPC"), the business PURIS purchased from him for $55 million.

Contrary to Mayer's sworn statement to this Court that he has "not solicited any of these former PURIS employees to resign from PURIS or to join Crown," his text messages confirm that he was actively doing so *even before he left PURIS*.

Days before his termination, Mayer texted a group of senior managers at MPC to plan a mass exodus to Crown: "███████████████████████████████████████████████████████████████████████████████████████████████████████████." The day after he was terminated, Mayer began planning to recruit additional MPC supervisors and crewmembers to join Crown, telling an MPC foreman: "…███████████████████

███████████████
███████." 

And, despite telling this Court that Crown had decided to terminate its competing lead-pipe business, Crown's documents have revealed that its largest touted contracts— $33 million for lead replacement work in Washington, D.C.— were actually *MPC's own contracts*, which Mayer secretly diverted to Crown before he left PURIS.[2]  Moreover, Mayer's denial of any role in having "wiped" all data from his PURIS-issued computers is belied by recently discovered evidence that *a Crown employee* wiped the computer before Mayer left PURIS.

Even under normal circumstances, a defendant cannot unilaterally cut off a plaintiff's right to relief by promising to cease the unlawful conduct.  A claim for injunctive relief may only become moot if: "(1) it can be said with *assurance* that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Reich v. Occupational Safety and Health Review Comm'n*, 102 F.3d 1200, 1201 (11th Cir.1997) (emphasis added).  And voluntary cessation especially cannot moot the need for an injunction where, as here, there is an ongoing pattern of misconduct and deception.  Given the newly revealed information, it is no wonder Mayer wants to circumvent further discovery and cut off the Court's ability to issue

---

[2] *See* Declaration of Jacob Fields (hereinafter, "Fields Decl.") Exs. 1 & 2.

an injunction. But the record is clear that, absent an order from the Court, he will only continue his campaign to destroy PURIS through deceptive means.

## II. Background

### A. Lead-up to this Action and PURIS's Request for Injunctive Relief

Within weeks of leaving PURIS, Mayer joined Crown to become the leader of Crown's new pipeline construction division. On January 24, Crown publicly touted Mayer's hiring to its investors as opening up this promising new line of business. Crown's own public descriptions of its business established that it was in direct competition with PURIS in the business of HDPE and lead pipe remediation.

On February 6, PURIS sent cease-and-desist letters to Mayer and Crown notifying them that Mayer's hiring was a direct violation of his non-compete agreement with PURIS (the "Agreement"). PURIS demanded that Mayer certify that he would cease working for Crown and would refrain from engaging in any competing business activities for 18 months.

After Mayer and Crown ignored those letters, PURIS filed this lawsuit and asked for a TRO and preliminary injunction to enforce the Agreement Not to Compete and specifically to prohibit Mayer from: (1) entering into or engaging in any business with any person or entity that competes with PURIS or MPC, including

4

Crown, for a period of 18 months; (2) soliciting MPC's employees to leave their jobs; and (3) using or disclosing PURIS's confidential information.[3]

### B. Mayer's Representations at the TRO Stage

In its papers and at the TRO hearing,[4] PURIS showed that, since at least August 2024, Crown has publicly marketed itself as a provider of HDPE-pipeline and lead-line services to municipalities, in direct competition with MPC within the non-compete's "Restricted Territory." Indeed, Crown had publicly boasted about landing contracts in at least three cities that were in direct competition with Puris's business, including $33 million in two lead-line remediation contracts in Washington, D.C., a location where PURIS does this same work:[5]

---

[3] Complaint, (ECF 1); PURIS LLC's Motion for a Temporary Restraining Order, Preliminary Injunction and Expedited Discovery and Memorandum of Law, (ECF 2) ("Motion for a TRO and Preliminary Injunction").
[4] *See* generally Transcript for the February 20, 2025 Hearing on PURIS's Motion for TRO ("TRO Hearing Tr.")
[5] PURIS's TRO Hearing Demonstrative at 8, available at https://ir.crownek.com/news_events/press_releases/detail/138/crown_pe_pipelines division_secures_two_contracts_for_lead).

> **September 23, 2024**  ⊟ CROWN
>
> **Crown PE Pipelines Division Secures Two Contracts for Lead Pipe Remediation Totaling $33 Million**
>
> LOS ANGELES, Sept. 23, 2024 (GLOBE NEWSWIRE) -- Crown Electrokinetics Corp. (NASDAQ: CRKN) ("Crown" or the "Company"), a leading smart glass technology company and an expert in constructing fiber optic networks and lead pipe inspection and remediation, today announced that its PE Pipelines division has secured two contracts valued at $33 million for lead pipe remediation. The work is scheduled to begin in January 2025.
>
> "These two contracts represent our first project in lead pipe remediation and the first project in PE Pipelines," says David Kinsella, President of PE Pipelines. "Opportunities like this continue to further Crown's mission to help transform infrastructure to improve people's lives. Lead in drinking water pipes represents an enormous problem for the United States of America and we are proud to be playing a key role to ensure people have safe drinking water."

Separately, PURIS submitted a declaration from its CEO describing how Mayer had begun targeting MPC employees to join Crown, either directly or through his associate, Mr. Lauren Romero (a Crown employee who had also been recently terminated from PURIS). As of February 12, MPC had become aware of at least two senior managers and a dozen of their crew members who had suddenly decided to leave. (ECF 2-1) Fegan Decl. at ¶ 28.

In response, Mayer denied that there had been any violation and said the public statements by Crown about its new competing business were not what they seemed. In a sworn declaration, he claimed that Crown had abandoned the tens of millions in contracts it had touted to its investors just a few months before in order to hire him. (ECF 17) Mayer TRO Decl. at ¶ 27. According to Mayer, Crown had changed its mind about its plan (which it had touted to investors in a December 2024 shareholder presentation) to pursue a lucrative pipeline of lead-remediation work

6

across the country. Mayer also flatly denied soliciting MPC employees to leave their jobs, either directly or indirectly. Mayer also denied having any involvement or knowledge of his PURIS computer being wiped.

At the hearing, the Court expressed concern about the evidence of apparent competitive activity and inquired of Mayer's counsel about potential inconsistencies implicated by Mayer's declaration. Ultimately, given Mayer's sworn denials, the Court denied the TRO and instructed the parties to agree on a plan of expedited discovery, including discovery from Crown. A preliminary injunction hearing was set for April 22, 2025.

### C. After Weeks of Stalling, Mayer Abruptly Attempts to Cut Off Discovery and Moot PURIS's Request for Injunctive Relief

On February 28, the parties submitted a Joint Status Report, in which they agreed to produce documents on an expedited basis and to have depositions during the period from March 26 to April 11. (ECF 26). Crown's then-lawyer refused to accept service of the subpoena, but eventually Mayer's lawyers were engaged to represent Crown as well. By March 24, as agreed, PURIS had substantially completed production of its documents (1,491 in total). Crown and Mayer produced a handful of documents (74 and 26, respectively), but promised to make "substantial" production on March 24.

Nothing was produced by Crown or Mayer on March 24. Instead, on March 25, Mayer abruptly resigned from Crown and purported to declare that PURIS's

7

request for injunctive relief was moot.⁶ Citing his resignation and his stipulations below, Mayer now asks the Court to cancel the hearing and stop the expedited discovery process. (ECF 34).

### D. Evidence Reveals that Mayer Was Not Forthcoming with the Court

Since the TRO hearing, the few documents produced by Mayer and Crown have shown that Mayer's previous sworn statements to the Court were untrue.

### i. Solicitation of MPC Employees

In his TRO Declaration, Mayer denied making "any efforts" to solicit the referenced MPC employees to leave their jobs and swore that he had "no idea what [PURIS's CEO] is referring to" with respect to PURIS's belief that he was recruiting MPC crewmembers through Lauren Romero. Mayer TRO Decl. ¶¶ 39-40.

In fact, by December 26 (five days before he left PURIS), Mayer had already laid the groundwork for a mass departure of MPC employees to Crown, texting five of MPC's senior personnel: "███████████████████████████████████████████████████████████████████████████████████████████"⁷ By December 29, Mayer told that same group

---

⁶ PURIS informed Mayer's counsel it opposed the motion because Mayer had not agreed to an injunction. When PURIS insisted that discovery proceed as directed by the Court, Mayer's counsel abruptly announced that Romero no longer worked for Crown so he couldn't be produced for his scheduled deposition on April 1.
⁷ Fields Decl. Ex. 3 - MAYER000330.

8

about his upcoming meeting with PURIS to discuss his future at the Company, stating: "█████████████████████."[8]

With respect to soliciting employees through Mr. Romero, Mayer's texts show that his plan to steal away MPC's employees continued *the day after he was terminated*:

<u>Dec. 31</u>: ███████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████[9]

By early February, Mayer was talking openly with Romero and Crown's CEO, Doug Croxall, about an organized effort to secretly hire MPC employees Ryan Burns, Todd Grafenauer, Richard Crow, and Lupe Quintero:

<u>Feb. 7</u>: ████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████[11]

<u>Feb. 8</u>: ████████████████████
████████████████████████████
████████████████████████████
████████████[12]

---

[8] Fields Decl. Ex. 4 - MAYER000325.
[9] Fields Decl. Ex. 5 - MAYER000341.
[10] Fields Decl. Ex. 6 - MAYER000284.
[11] Fields Decl. Ex. 7 - MAYER000345-46, Ex. 8 - MAYER000350.
[12] Fields Decl. Ex. 9 - MAYER000273.

Feb. 9: ████████████████████████
████████ ████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
██████████████████████.[13]

Feb. 9: ████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████"[14]

Feb. 11: ██████████████████████
████████████████████"[15]

### ii. Crown's Competing Business Activities

In his TRO Declaration, Mayer stated that Crown had recently "made the decision to no longer do lead pipeline renewal work, and did not contract with Washington, D.C." for $33 million in lead-line remediation work, despite the company's prior September 2024 public announcement. Mayer TRO Decl. ¶ 27.

This was a complete ruse: PURIS learned for the first time in discovery that Crown's $33 million lead work "contracts" announced in September were actually ***subcontracts with MPC, signed by Mayer himself***.[16] In other words, before leaving PURIS Mayer was already siphoning millions of dollars of lead-remediation work

---

[13] Fields Decl. Ex. 10 - MAYER000297-98.
[14] Fields Decl. Ex. 11 - MAYER000095.
[15] Fields Decl. Ex. 10 - MAYER000298.
[16] Fields Decl. Exs. 1-2.

to Crown in apparent anticipation that he would soon go to work there. It was only when PURIS cited the contracts as evidence of his violations of his Agreement Not to Compete in support of the TRO Application that Mayer apparently made the decision not to proceed with these contracts.

This theft of business continued after Mayer joined Crown. At the TRO stage, Mayer swore that "Crown does not compete with PURIS in the business of 'providing trenchless pipe rehabilitation solutions and technology to the municipal wastewater and water markets,'" and that he is "not engaged in any such competing business for Crown." Mayer TRO Decl. ¶ 20. He also denied having "market[ed] to any of the specific customer accounts" from his time at MPC. *Id.* ¶ 38. Yet Mayer's texts show that, after joining Crown, he was doing just that:

Feb. 12: "[17]

    iii.    <u>Wiping of MPC Computers</u>

At the TRO hearing, Mayer's counsel relayed his client's denial that he deleted any data on his PURIS-issued computers, despite PURIS's evidence that both devices were factory-reset shortly before Mayer was terminated. Since the

---

[17] Fields Decl. Ex. 12 - MAYER000424.

TRO hearing, additional forensic analysis on Mayer's laptop has revealed that this device was wiped by Crown itself. Specifically, evidence will show that the last recorded activity was by a user account linked to a ***Crown email address*** (i.e., with the domain @crownek.com). On November 21, 2024 (one month before Mayer left PURIS), this Crown employee Google-searched "***how to reset computer to factory settings***," and Mayer's PURIS computer was wiped later that same day.

### III.    ARGUMENT

#### A.    Mayer Cannot Unilaterally Moot PURIS's Entitlement to Injunctive Relief—Especially Given His Previous Untruths.

Mayer's resignation and declaration are no basis to cancel the hearing and cut off PURIS's request for an injunction. "There is a need for immediate injunctive relief where employers are *threatened* by conduct of former employees that would irreversibly alter the status quo." *S.E. Mech. Servs., Inc., v. Brody*, 2008 WL 4613406 at *15 (M.D. Fla. Oct. 15, 2008) (emphasis added) (internal quotations and citations omitted). PURIS demonstrated this threat when it first sought immediate injunctive relief.

Even under normal circumstances, a defendant cannot unilaterally cut off a plaintiff's right to relief by suddenly promising to cease the unlawful conduct. A claim for injunctive relief may only become moot if: "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the

effects of the alleged violation." *Reich v. Occupational Safety and Health Review Comm'n*, 102 F.3d 1200, 1201 (11th Cir.1997).

Such an assurance is absent in this case, where Mayer has flagrantly and repeatedly violated his Agreement Not to Compete, deceptively attempted to cover up his violations, and continues to deny that any violations ever occurred. Indeed, it is well established that a defendant's voluntary cessation of prohibited conduct does not automatically moot a claim for injunctive relief, and "[a] history of similar conduct or evidence of subsequent violations weighs against a finding of mootness." *Mitsubishi Hitachi Power Sys. Ams., Inc. v. Siemens Energy, Inc.*, 2021 WL 2954416, at *3 (M.D. Fla. Jan. 6, 2021) (finding, in case asserting misappropriation of trade secrets, that claim for injunctive relief was not mooted by the defendant's assertion that it deleted all trade secret information because, inter alia, of the defendant's history of similar conduct and subsequent violations); *see also Lutario v. City of Hollywood*, Fla., 683 F. Supp. 3d 1361, 1367 ("[A] party choosing to end conduct alleged to be illegal does not necessarily deprive the tribunal of the power to hear and determine the case. Since the defendant is 'free to return to his old ways,' he bears the 'heavy burden' of demonstrating that his cessation of the challenged conduct renders the controversy moot." (citations omitted)).

As shown by the examples above, Mayer has made plain that he will continue seeking to harm PURIS through unlawful competition. In the face of this evidence, his unilateral attempt to moot PURIS's right to relief should be rejected out of hand.

### B. Mayer's Stipulations Do Not Address the Conduct PURIS Seeks to Enjoin

Even if the Court gave any credence to any of Mayer's current representations—which it should not—Mayer's stipulations would still not moot any of PURIS's claims. Mayer states that he will not "*take employment or work*" for any competing business for 18 months. (ECF 34-1) Mayer Decl. at ¶ 6 (emphasis added). But the injunction PURIS seeks is broader. Consistent with the Agreement Not to Compete, Puris seeks to enjoin Mayer from *entering into* and *engaging* in any competing business, which would prohibit Mayer from continuing to own or otherwise profit from a competing business. Mayer has not agreed to refrain from these activities.

Second, Mayer's stipulations do not define crucial terms that would govern the scope of prohibited activities. Namely, Mayer says he will not "work for any company that is 'a competing business' within the 'Restrictive Territory' as those terms are defined in the Agreement Not to Compete." *Id*. at ¶ 6. But, as discussed at in the parties' TRO papers and hearing, the definition of those two terms is a

central point of dispute.[18] To date, Mayer has taken the position that the "Restricted Territory" means only the 16 cities in which PURIS has offices, while PURIS contends it spans the US cities where PURIS has performed pipeline work for the past two years.[19] Likewise, Mayer asserts that work on pipelines at least 54" in diameter is not a "competing business" because MPC only works on smaller pipes—an interpretation which MPC disputes. Mayer's declaration gives him total discretion over the very questions PURIS has asked the Court to decide.

## CONCLUSION

Mayer's attempt to circumvent the Court's authority and to bury the truth should be rejected. Given his pattern of flagrantly violating his Agreement Not to Compete, his deceptive attempts to cover up the violations, and his ongoing denial that any of his prior conduct constituted a violation, his abrupt resignation does not moot the need for injunctive relief. To protect itself from further harm, PURIS is entitled to the injunctive relief it has requested. The Court should deny Mayer's motion to cancel the preliminary injunction hearing and for relief from the associated expedited discovery.

---

[18] *See* Defendant's Response in Opposition to Motion for a Temporary Restraining Order (ECF 20) at 9-10, 12-16; Hearing Tr. 12:9-13:7, 17:20-18:7.

[19] PURIS seeks to enjoin Mayer from entering into or engaging in any business with any person or entity that competes with PURIS or MPC in the provision of trenchless pipe rehabilitation solutions and technology to the municipal wastewater and water markets within 50 miles of the cities, counties and municipalities identified in Exhibit 1-A to PURIS's motion for injunctive relief. (ECF 2-2).

Dated: March 27, 2025                    Respectfully submitted,

ALLEN OVERY SHEARMAN
STERLING US LLP

 /s/ Thad Behrens
Thad Behrens (*pro hac vice*)
Jacob Fields (*pro hac vice*)
Danielle Canfield Vorbrodt (*pro hac vice*)
2601 Olive Street, 17th Floor
Dallas, Texas 75201
Telephone: (214) 271-5777
thad.behrens@aoshearman.com
jacob.fields@aoshearman.com
danni.vorbrodt@aoshearman.com

GUNSTER YOAKLEY & STEWART, P.A.

William K. Hill
Florida Bar Number 747180
Lauren V. Purdy
Florida Bar Number 93943
Rebecca A. Maturo
Florida Bar Number 1049429
1 Independent Drive, Suite 2300
Jacksonville Florida 32202
Telephone:  (904) 354-1980
Facsimile: (904) 354-2170
whill@gunster.com
lpurdy@gunster.com
rmaturo@gunster.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2025, the foregoing document was filed on the Court's ECF filing system, which effected electronic service on all counsel of record.

*/s/ Jacob Fields*
Jacob Fields
