## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

PURIS LLC AND
MURPHY PIPELINE
CONTRACTORS, LLC,

       *Plaintiffs*,

v.

ANDREW J. MAYER *et al.*,

       *Defendants*.

Case No. 3:25-cv-00157-TJC-PDB

## MOTION FOR PRELIMINARY INJUNCTION
## AGAINST DEFENDANTS CMG PIPELINES, INC. AND CARMELO
## GUTIERREZ AND REQUEST FOR EXPEDITED DISCOVERY

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs PURIS, LLC ("PURIS") and Murphy Pipeline Contractors, LLC ("Murphy"), through counsel, submit this motion for preliminary injunction against Defendants CMG Pipelines, Inc. ("CMG") and Carmelo Gutierrez (together, the "CMG Parties").

## PRELIMINARY STATEMENT

The evidentiary record shows that the CMG Parties have, for years, willingly served as a conduit for Defendant Andrew Mayer to violate the contractual and fiduciary duties he owed to Plaintiffs as President of Murphy: Mayer co-founded CMG as a "silent partner," secured it an exclusive license for a competing technology, gave it Murphy's confidential information, obtained its main source of financing, and repeatedly steered opportunities away from Plaintiffs to CMG. All

the while, Mayer and the CMG Parties carefully hid their partnership from Plaintiffs.

Mayer propped up CMG to eventually be a mirror-image competitor of Murphy, all in an effort to take back the business PURIS purchased from him in 2021 for $55 million. Last year, Mayer's multi-year scheme to turn CMG into Murphy 2.0 accelerated when he began marketing the company for sale to Defendant Crown Electrokinetics Corp. ("Crown"), in a transaction where Mayer and Gutierrez would share equally in the proceeds. In a span of months, CMG went from a purely local construction subcontractor in Louisiana to a multi-state competitor offering the same innovative HDPE solutions as Plaintiffs. There is zero indication Gutierrez had the experience, capital, technology, workforce, or customer contacts to account for this explosion in growth. Mayer was responsible for all of it.

In a blatant circumvention of Mayer's Non-Compete Agreement, Mayer and the CMG Parties are still actively working to destroy Plaintiffs' business by transforming CMG into Murphy's clone. With Mayer's help, CMG has already used Plaintiffs' confidential information to steal at least two Murphy customers, and it is actively soliciting others. It is doing so with the help of at least 27 Murphy employees whom Mayer solicited to leave to join CMG in the past seven months. Absent injunctive relief, CMG will continue carving away Plaintiffs' technology, crews, customers, and goodwill—the definition of irreparable harm.

The law provides that the CMG Parties' tortious interference with Plaintiffs' contractual rights, as well as their aiding and abetting in Mayer's fiduciary breaches, justifies enjoining them from competitive activities to the same extent as Mayer. The Court can and should prohibit both from competing with Plaintiffs in the provision of trenchless pipeline rehabilitation services, which they could not have done absent their wrongdoing.

## STATEMENT OF FACTS[1]

### I.    Plaintiffs and the Trenchless Pipeline Rehabilitation Industry

Murphy is PURIS's wholly owned subsidiary. It specializes in rehabilitating municipal water and sewer systems, primarily through three "trenchless" technological methods that utilize HDPE pipe lining: pipe bursting, sliplining, and Murphy's proprietary CompressionFit™ process.[2] These methods avoid the need to dig up existing pipe, saving customers the downtime and expense of a full "open-cut" excavation. Murphy performs projects throughout the United States and Canada, and it employs crews whose members have been specially trained.[3]

---

[1] In support of this motion, Plaintiffs are contemporaneously filing the Declaration of Richard Crow (hereinafter "Crow Decl.") and Declaration of Jacob Fields (hereinafter "Fields Decl."), together with their respective exhibits.

[2] Crow Decl. ¶¶ 6-8.

[3] *Id.* ¶ 8.

## II.     Mayer Sells Murphy to PURIS and Non-Compete Agreements Are Executed

On October 1, 2020, PURIS purchased Murphy from Mayer for approximately $55 million.[4] It hired Mayer to continue running Murphy, alongside Defendant Todd Grafenauer, one of Mayer's long-time Murphy executives.[5] As part of their continued employment, Mayer and Grafenauer each executed an identical Agreement Not to Compete (as amended, the "Non-Compete"),[6] in which they agreed that, during their employment and for a period of 18 months thereafter, they would not directly or indirectly: (1) engage in any competing business; (2) solicit or sell to customers for any competing business; (3) divert, or attempt to divert, any customers, business, or orders from Plaintiffs; or (4) otherwise support any competing business, financially or otherwise.[7]

The Non-Compete also prohibits disclosing or using Plaintiffs' confidential information and trade secrets, as well as "raiding any of the Company's employees or soliciting any of them to resign from their employment[.]"[8] It acknowledges that a breach would cause irreparable harm.[9]

---

[4] Declaration of Michael Fegan in Support of Plaintiff's Motion for a Temporary Restraining Order, ("Fegan Decl.") Dkt. 2-1, at ¶¶ 5, 9-10.

[5] *See id.* at ¶ 10.

[6] Fields Decl. Exs. 1-2. The Non-Competes were both amended on January 9, 2023, which extended the post-employment covenants from 12 to 18 months, subject to tolling. *Id.* Ex. 3-4.

[7] Fields Decl. Exs. 1-2 § 1(b)(ii). While employed, Mayer and Grafenauer were prohibited from competing with Plaintiffs anywhere in the world; post-termination, the prohibitions were limited to the defined Restricted Territory. *See id.* § 1(b)(i)(A).

[8] *Id.* § 1(g).

[9] *Id.* § 1(l).

### III.  Mayer and Gutierrez Secretly Create CMG

Within a few months of selling Murphy to PURIS, Mayer began plotting to "get [his] company back."[10] While serving as Murphy's president, he secretly began to form CMG and other new entities to eventually compete with Murphy.[11] In this litigation, Mayer was forced to produce documents revealing that his move to Crown was the culmination of a years-long scheme to siphon PURIS's profits and market share through a half-dozen propped-up competitors and controlled vendors, which Mayer would later market for sale as a package to Crown.[12] Indeed, as Mayer would tell Crown, CMG's value was driven by the fact that, as Murphy's president, he could "pull the strings and build the Goliath from within."[13]

Until 2021, Gutierrez was a project manager for Wallace C. Drennan, Inc., a general construction contractor in New Orleans.[14] Since Drennan lacked experience in the trenchless services offered by Murphy, it occasionally hired Murphy to perform pipeline work as a subcontractor,[15] and Mayer and Gutierrez became acquainted through those dealings.[16] In October 2021, Mayer agreed to be

---

[10] Crow Decl. Ex. J.

[11] *See id.*

[12] Fields Decl. Ex. 5.

[13] Fields Decl. Ex. 22.

[14] Fields Decl. Ex. 6.

[15] Drennan does not perform any pipe bursting, sliplining, or other trenchless HDPE work of the kind performed by Murphy. Crow Decl. ¶ 16.

[16] Crow Decl. ¶ 17.

Gutierrez's "silent partner" in CMG, which was "set up to gather experience in the same fields as Murphy" and compete in trenchless services.[17]

Mayer invited Grafenauer and Richard Crow, another Murphy employee, to invest with him in CMG.[18] In 2022, Gutierrez began sending the group CMG's periodic financial statements and business updates, always using their personal, non-Murphy, email accounts.[19] Mayer and Gutierrez also transmitted large sums of money to each other through personal accounts, transferring over $1 million from July 2023 – June 2024 alone.[20]

## IV. CMG Initially Appears to be a Local Subcontractor in Louisiana Doing Dig Work

In 2022, Mayer caused Murphy to grant CMG subcontracts as a local operator to perform "dig work," restoration, and other ancillary services in New Orleans.[21] Over time, Murphy increased the scope of work subcontracted to CMG for New Orleans projects.[22] Eventually, at Mayer's direction, CMG began to perform its own pipeline repair work with training from Murphy crews.[23]

---

[17] Fields Decl. Ex. 5.

[18] *See* Crow Decl. ¶¶ 18-22.

[19] Crow Decl. ¶ 22, Exs. B, F.

[20] In July 2023, CMG sent $250,107.25 to Murphy Newco, Inc., Mayer's wholly owned entity Fields Decl. Ex. 7. In June 2024, Mayer used his personal account to send $200,000 to Gutierrez and $600,000 to CMG. *Id*. Ex. 8.

[21] Crow Decl. ¶ 26.

[22] Crow Decl. ¶ 27.

[23] *See* Crow Decl. ¶¶ 28, 30, 54.

## V. Mayer and Gutierrez Implement Their Plan to Transform CMG Into a Murphy Competitor

In 2023, Mayer secured additional financing for CMG, including a multimillion-dollar loan which Mayer "saw the opportunity to put . . . into CMG name and not Murphy."[24] By 2024, Mayer was helping CMG identify competing pipeline contracts, including a $10 million award in New Orleans called the Florida Avenue Development ("FAD") project.[25] That job came open for bidding in March 2024, and was one of the first instances where CMG bid against Murphy as a prime contractor.[26] Emails later showed that Gutierrez and former Murphy employee Ernie Brown (acting in concert with Gutierrez and Mayer), engaged in bid-rigging to ensure CMG's bid was lower than Murphy's.[27] CMG won the contract.[28]

By mid-2024, the effort to grow CMG went into overdrive. Mayer and Grafenauer began diverting new jobs to CMG, which should have been performed by Murphy—where they both remained employed. When sending these jobs to Gutierrez, both always used their non-work emails. For example, in August 2024, Grafenauer flagged for CMG a potential HDPE project in Helper, Utah valued at over $2 million.[29] On October 11, 2024, Grafenauer emailed Mayer, copying Gutierrez, presenting an opportunity to quote a job in Rio Tinto Kennecott in

---

[24] Fields Decl. Ex. 5.
[25] Fields Decl. Exs. 9-10.
[26] Crow Decl. ¶ 28.
[27] *See* Crow Decl. ¶¶ 28-29, Exs. H-I.
[28] Crow Decl. ¶ 28.
[29] Fields Decl. Ex. 11.

Utah.[30] Grafenauer told Mayer: "Let me know if you want CMG to submit [a bid] or if I should send to you at [Murphy]."[31] Gutierrez also asked Mayer where the job should go. Mayer told them to send it to CMG.[32] Prior to 2024, CMG had never worked outside of New Orleans.[33] By late 2024, CMG suddenly began registering to do business in Nebraska, Florida, and other states where Murphy has customers.[34]

During this period, Mayer also secured CMG an exclusive license with "Die-Draw," a slip-lining technology virtually identical to Murphy's CompressionFit—one of the company's most valuable business lines.[35] The sole reason for the license was to let CMG compete with CompressionFit: in at least one discussion about pitching a new customer for CMG, Grafenauer told Mayer and Gutierrez that he "[r]emoved [reference to] CompressionFit and just calling it PE pipe lining for now. Can change back or call it Die Draw if needed."[36] In subsequent discussions about CMG projects, Mayer and Gutierrez repeatedly referenced "CF" work.[37]

In 2025, after Mayer was terminated from Murphy, CMG started pursuing Murphy's customers openly. For example, the Metropolitan Utility District of

---

[30] Fields Decl. Ex. 12.

[31] *Id.* at MAYER002259.

[32] *Id.* at MAYER002257.

[33] Crow Decl. ¶ 31.

[34] *See* Crow Decl. ¶ 32, Fields Decl. Exs. 13-15.

[35] Crow Decl. ¶ 30; Fields Decl. Ex. 5.

[36] Fields Decl. Exs. 5, 16.

[37] For instance, in January 2025, after Mayer left Murphy, Gutierrez texted Mayer "24 in CF. 2000' $750-$800 LF?" Fields Decl. Ex. 17.

Omaha, Nebraska ("MUD") was an existing Murphy customer that, in late 2024, informed Murphy that it would soon be awarding Murphy pipeline repair work under a new $30 million contract.[38] However, in April 2025 Murphy learned that MUD instead awarded the job to CMG.[39] And, because CMG had also just hired two known Murphy project managers (Lupe Quintero and Ryan Burns), MUD agreed to give CMG the contract.[40] Quintero and Burns were both solicited by Mayer through co-defendant Lauren Romero.[41]

Since then, CMG has continued to solicit existing Murphy customers using former Murphy employees.[42] In May 2025, Lauren Romero[43] sought work for CMG on two projects from the Davie, Florida municipality—a current Murphy customer.[44] That customer affirmed that Davie would sign an agreement with CMG that "would be similar to what we have in place for Murphy" and "should be in place by July" of 2025.[45] This despite the fact CMG had never worked in Florida.

---

[38] Crow Decl. ¶ 41.

[39] *Id.*

[40] On February 12, 2025, Mayer sent a text message to Croxall stating: "[G]ot an opportunity with an old client who said Puris can go do one [project] and if Lupee and Mike Brown is involved with CMG they would give us 6 to 8M of work . . . what do you think?" Croxall responded, "Say yes to it for now. Secure it so we can work with Josh to structure it properly." Fields Decl. Ex. 18.

[41] On Dec. 31, Mayer texted Romero: "tell all your guys we got them and Lupee, Marco, Mikey I got them too just I can't be involved just yet. There [sic] empire i will collapse." Fields Decl. Ex. 19. On Feb. 9, Romero told Mayer: "Lupe, broke the news to Murphy that he was leaving . . . I had Lupe say that he was leaving to his brothers company . . . that I would get into problems if he was coming with me." *Id.* Ex. 20.

[42] *See* Crow Decl. ¶¶ 47-50, Exs. M-N.

[43] As the Court may recall, Romero is a former Murphy employee who was terminated from Murphy in December 2024. After his termination, he joined Crown, but resigned before his scheduled deposition, along with Mayer. Romero is now an employee at CMG. Crow Decl. ¶ 48.

[44] Crow Decl. ¶¶ 44-45, Ex. M.

[45] Crow Decl. Ex. N.

Since January, Gutierrez and CMG have hired at least 27 Murphy employees solicited directly or indirectly by Mayer in breach of his Non-Compete.[46]

## VI. Mayer and Gutierrez Attempt to Complete The Plan by Co-Opting Murphy's Proprietary Information and Providing It to Crown

From June 2024 through at least February 2025, Mayer negotiated the terms of CMG's putative sale to Crown with no apparent involvement by Gutierrez. In those discussions, Mayer and Crown exchanged numerous valuation and payment proposals reflecting that Mayer and Gutierrez would each receive **40% of CMG's sale proceeds**, while Crow and Grafenauer would each receive 10%—a percentage that directly corresponds to their respective equity interests in CMG.[47] In September 2024, Mayer offered to sell CMG to Crown for $30 million.[48]

When Mayer shared "The PLAN" with Crown, he attached as Appendix B a "Funnel" of CMG's potential trenchless projects through 2026.[49] With the exception of a few line items, that list is virtually identical in form and content to the Murphy's own confidential project-development list.[50] This curated list reflects years of marketing and relationship-building efforts by Murphy, and CMG has recently contacted at least two customers on it.[51]

---

[46] Crow Decl. ¶¶ 47-50; Fields Decl. Ex. 20.

[47] Fields Decl. Ex. 21, Ex. 22; *see* Crow Decl. ¶ 23.

[48] Fields Decl. Ex. 22; Mayer Decl. Dkt. 54-1 at ¶ 13.

[49] Fields. Decl. Ex. 5. Evidence will also show Mayer sent PURIS's confidential financial statements to Crown.

[50] *Compare* Fields. Decl. Ex. 5 *with* Crow Decl. Ex. K.

[51] Crow Decl. ¶¶ 39-45; *see id.* ¶¶ 10-13.

## VII.  Relief Sought in the Instant Motion

PURIS and Mayer previously stipulated to entry of a preliminary injunction, which prohibits Mayer from directly or indirectly competing with Plaintiffs, and also enjoins "any other persons or entities acting in concert or participation with Mayer," including CMG and Gutierrez. (Dkt. 42 at ¶ 1).[52] Since they were not yet parties, CMG and Gutierrez were not directly enjoined.

On July 7, Plaintiffs filed their First Amended Complaint, asserting claims against CMG and Gutierrez (and others) for RICO violations, tortious interference, aiding and abetting in breaches of fiduciary duties, and others. (Dkt. 62). To prevent further irreparable harm, Plaintiffs now seek a preliminary injunction to stop CMG and Gutierrez from soliciting Plaintiffs' customers or employees, and from otherwise providing trenchless pipe rehabilitation services.

## ARGUMENT

## I.    Plaintiffs Are Entitled to Injunctive Relief

A preliminary injunction is appropriate when the moving party shows: (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) such injury outweighs the injunction's potential harm to the opposing party; and (4) the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). "There

---

[52] On May 28, 2025, CMG and Gutierrez filed a Motion for Relief from the Injunction, which the Court granted. (Dkt. 46, 49). On June 10, PURIS filed a motion to reinstate, which is fully briefed. (Dkt. 50, 54, 84). The instant motion does not moot the former one, which merely seeks to bind the CMG Parties from acting in concert or participation with Mayer.

is a need for immediate injunctive relief when employers are threatened by conduct of former employees that would irreversibly alter the status quo." *S.E. Mech. Servs., Inc. v. Brody*, 2008 WL 4613046, at *15 (M.D. Fla. Oct. 15, 2008).

## A. Plaintiffs are substantially likely to succeed on the merits

### 1. Tortious interference claims.

A tortious interference claim requires: (1) a contract or business relationship that affords the plaintiff existing or prospective legal rights; (2) defendant's knowledge of the relationship; (3) defendant's intentional and unjustified interference with the relationship; and (4) resulting damages. *Commodores Ent. Corp. v. McClary*, 324 F. Supp. 3d 1245, 1256 (M.D. Fla. 2018).

#### *(1) Interference with Non-Compete Agreements.*

Plaintiffs had existing contract rights in the Non-Compete,[53] which precluded Mayer and Grafenauer from: (i) competing against Plaintiffs during their employment and for 18 months after leaving; (ii) raiding Plaintiffs' employees; (iii) soliciting Plaintiffs' customers; and (iv) disclosing Plaintiffs' confidential information. The CMG Parties knew about these agreements. Indeed, the Non-Compete was explicitly referenced in the purported "loan agreement" used to conceal Mayer's, Grafenauer's, and Crow's investments.[54] Despite this knowledge, they intentionally helped deprive Plaintiffs of their rights by serving as

---

[53] Mayer has never disputed that the noncompete agreement is valid and enforceable.

[54] Crow Decl. ¶ 20, Ex. A (reflecting Gutierrez's promise to transfer CMG equity upon "the termination of Lender's Covenant Not to Compete . . . that is currently in place").

the conduit through which Mayer and Grafenauer would circumvent their obligations—and thus interfered with PURIS's contractual rights—by willingly:

- accepting and benefitting from Mayer's and Grafenauer's investment and financial support;

- receiving and misappropriating Plaintiffs' confidential information, including Murphy's project list which detailed its cultivated job pipeline;[55] and

- hiring dozens of Murphy employees wrongfully solicited by Mayer, then utilizing those employees to target Murphy customers.

These instances are more than sufficient to temporarily enjoin CMG and Gutierrez, as "[p]roof of the benefit received from the former employees' breaches . . . is sufficient under Florida law to maintain an injunction against the new employer, particularly where the employer was on notice of the violations." *Family Heritage Life Ins. Co. of Am. v. Combined Ins. Co. of Am.*, 319 So.3d 680, 685 (Fla. Dist. Ct. App. 2021) (enjoining new employer from competing against plaintiff based on participation in former employee's breaches).

> (2)  *Interference with Murphy's customer contracts and other business relationships*

With information from Mayer, CMG has already stolen business that had been prospectively awarded to Plaintiffs. Evidence shows Gutierrez and CMG have used Murphy's project list to target Murphy customers in Florida, including the

---

[55] Crow Decl. ¶¶ 34-39, 51-62; *see id.* ¶¶ 10-13; *compare* Fields Decl. Ex. 5 *with* Crow Decl Ex. K

Town of Davie and Tampa.[56]

CMG has also utilized wrongfully-solicited Murphy employees to target and steal Murphy's customer, MUD, in Omaha, Nebraska. As noted, in late 2024, MUD told Murphy that it would be awarding an upcoming job to Murphy. However, in February 2025, text messages show that Mayer—by and through Lauren Romero—successfully solicited several key Murphy employees to join CMG, including Michael Brown, Ryan Burns, and Lupe Quintero.[57] Those employees all developed relationships with MUD while working for Murphy; as soon as they joined CMG, text messages show Mayer and CMG began targeting MUD for the purpose of stealing its business.[58] By April, MUD pulled the job from Murphy and gave it to CMG, just as Mayer and Gutierrez planned.[59]

Finally, in addition to targeting Murphy's customers, the evidence shows that CMG and Mayer used other means to hamper Plaintiffs' ability to perform on existing customer projects, including by stealing Murphy's custom CompressionFit equipment and raiding Murphy's skilled employees.[60]

---

[56] Crow Decl. ¶¶ 43-46. The conversion and use of customer lists may constitute tortious interference with a business relationship. *See Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1145 (M.D. Fla. 2007).

[57] Fields Decl. Exs. 18, 20.

[58] Fields Decl. Ex. 18.

[59] Crow Decl. ¶¶ 41-42.

[60] Crow Decl. ¶¶ 47-62. *See Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339, 1351 (M.D. Fla. 2014) ("[T]he great weight of Florida authority indicates that a cause of action exists for tortious interference with an at-will employment relationship.").

## 2.    Aiding and abetting breach of fiduciary duty

Under Florida law,[61] this claim requires: (1) the existence of a fiduciary duty, (2) breach, (3) defendant's knowledge of the breach, and (4) the defendant's substantial assistance or encouragement of the wrongdoing. *Aquent LLC*, 65 F. Supp. 3d at 1350. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* The evidence supports each element.

Mayer—as president of Murphy—owed fiduciary duties of care, loyalty, and candor, which flowed to PURIS as its sole shareholder. *Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1208–09 (Del. Ch. 2010) (fiduciary cannot place interest of others above companies for which he serves). He breached those duties by, among other things:

- Forming, operating, financing, and propping up CMG to be a mirror image competitor of Murphy's;

- Diverting corporate opportunities from Murphy to CMG including numerous bidding opportunities, financing, and competing "Die Draw" technology rights; and

- Misappropriating Plaintiffs' assets, including proprietary and confidential technology, processes, customer lists, pricing information, and employees to give CMG a competitive advantage.[62]

---

[61] In Florida, the internal affairs doctrine mandates that the law of a company's state of incorporation governs claims for breach of fiduciary duty. *Mukamal v. Bakes*, 378 F. App'x 890, 896-97 (11th Cir. 2010). Murphy is a Delaware corporation (*see* Fields Decl. Ex. 24), so Delaware law governs Plaintiff's claims for breach of fiduciary duty. However, Florida law governs Plaintiffs' aiding and abetting claim, as it is based on conduct outside of Plaintiffs' internal affairs. *Aquent*, 65 F. Supp. at 1350 n.12.

[62] *See* Crow Decl. ¶¶ 18-19, 22-33, 36-62; Fields Decl. Exs. 9, 12, 16-17, 18-19, 25-27.

*See Sorrento Therapeutics, Inc. v. Mack*, 2023 WL 5670689, at *23–28 (Del. Ch. Sept. 1, 2023) (fiduciary breached duties by diverting corporate opportunities, competing against employer, and misappropriating corporate assets).

Despite knowledge of these duties, the CMG Parties substantially assisted Mayer's fiduciary violations, by affirmatively assisting and helping to conceal Mayer's wrongful conduct. *Aquent LLC*, 65 F. Supp. 3d at 1350. Evidence shows:

- Gutierrez helped Mayer form and operate CMG in competition with Plaintiffs, causing CMG to accept the Die Draw license and a PPP loan diverted by Mayer;[63]

- CMG secretly coordinated with Mayer and Grafenauer to identify at least five trenchless projects throughout the country and divert them from Murphy to CMG; [64] and

- CMG assisted Mayer in diverting Murphy's CompressionFit equipment, and took possession of those items.[65]

The CMG Parties took measures to conceal theirs and Mayer's wrongful conduct, including by communicating through personal emails and text messages and concealing Mayer's ownership and involvement in CMG.

## B. Plaintiffs will continue suffering irreparable harm absent injunctive relief

It is well-settled that an employer suffers irreparable injury when a former employee competes in violation of a restrictive covenant and by exploiting the employer's confidential and proprietary information. *See, e.g.*, *Osborne Assocs.*,

---

[63] Crow Decl. ¶¶ 18-19, 31-50, 60-62; *see* Fields Decl. Ex. 5.
[64] Crow Decl. ¶¶ 31-46, Fields Decl. Exs. 9, 12, 20, 25-27.
[65] Crow Decl. ¶¶ 51-59; Fields Decl. Ex. 19.

*Inc. v. Cangemi*, 2017 WL 5443146, at *15 (M.D. Fla. Nov. 14, 2017). Indeed, irreparable injury is presumed.[66] FLA. STAT. § 542.335(1)(j); *Lincare, Inc. v. Tinklenburg*, 2020 WL 10354020, at *5 (M.D. Fla. June 26, 2020).

That logic equally holds where, as here, an employee violates his restrictive covenants and proceeds to supply his former employer's confidential and proprietary information to a competing entity. *See Osborne Assocs., Inc.*, 2017 WL 5443146, at *15 (irreparable harm where former employees' new company gained at least one of plaintiff's customers, in newly entered market, through use of knowledge gained from former employees); *Confianca Moving Inc. v. De Oliveira*, 2011 WL 13269500, at *6 (S.D. Fla. Jan. 24, 2011) (irreparable harm where the plaintiff "faces the risk of permanent destruction of its existing customer and/or employee relationships, reputation in the industry, and goodwill").

Plaintiffs have suffered—and will continue to suffer—irreparable injury if the CMG Parties are not enjoined. CMG exists in its present form only because of its knowing, covert use of Plaintiffs' confidential information, which Mayer provided in breach of his contractual and fiduciary duties. CMG entered the trenchless space after:

- Mayer misappropriated—and provided to Gutierrez and CMG—Murphy's proprietary project-development list (in violation of his non-disclosure covenant and duty of loyalty);[67]

---

[66] The fact that the Non-Compete stipulates the need for an injunctive remedy for any breaches "further supports a finding of irreparable harm." *Perma-Liner Indus., LLC v. D'Hulster*, 2022 WL 1620234, at *11 (M.D. Fla. Feb. 3, 2022).

[67] Fields Decl. Ex. 5; *see* Crow Decl. ¶¶ 34-39.

- Mayer procured financing for CMG and brokered its exclusive Die Draw license (in violation of his covenant not to compete during employment and duty of loyalty);[68]
- Directly and indirectly, Mayer solicited numerous Murphy employees to CMG, including full crews of highly-skilled tradesmen, (in violation of Mayer's nonsolicitation covenant and duty of loyalty).[69]

CMG has already used that information to target existing Murphy customers and employees. Allowing it to target even more, and otherwise to continue competing against Plaintiffs under these circumstances, will irreparably damage Plaintiffs' goodwill and ability to fairly compete for trenchless pipeline services.

## C. The balance of harms favors entering the requested injunction

Plaintiffs merely seek to enjoin CMG from reaping the fruits of its unlawful collaboration with Mayer. *See Confianca Moving Inc.*, 2011 WL 13269500, at *7. Plaintiffs spent significant time, money, and energy developing their proprietary trenchless methodologies, project-development lists, and other confidential information that was stolen by Mayer and wrongfully provided to the CMG Parties.[70] *See id.*; *Se. Mech. Servs. Inc.*, 2008 WL 4613046, at *16; *U.S. Lawns, Inc. v. Landscape Concepts of CT, LLC*, 2016 WL 9526340, at *9 (M.D. Fla. Oct. 31, 2016).

In contrast, any resulting harm to CMG and Gutierrez is "self-inflicted, and stem[s] from the operation of an illegitimate business." *JTH Tax Inc. v.*

---

[68] Fields Decl. Ex. 5, Ex. 28.
[69] Fields Decl. Exs. 1-2; Crow Decl. ¶¶ 47-50.
[70] Crow Decl. ¶¶ 5-13, 29-30, 34-39, 60-62.

*Abikarram*, 2019 WL 2254816, at *4 (S.D. Fla. Mar. 22, 2019), *R & R adopted*, 2019 WL 11553446 (S.D. Fla. July 19, 2019). Thus, the requested injunction is a "predictable consequence" of CMG's actions that merely prevent it from continuing to profit from the ill-gotten competitive advantages unlawfully steered to it by Mayer. *Rooterman LLC*, ___ F. Supp. 3d ___, 2025 WL 1088043, at *6; *see Confianca Moving Inc.*, 2011 WL 13269500, at *7.

Further, the requested injunction would not prevent CMG from operating or Gutierrez from earning a living. Prior to conducting work secured for it by Mayer, CMG conducted open-cut pipeline repair services, restoration, and other drain line cleaning services.[71] The requested injunction would in no way interfere with CMG's or Gutierrez's ability to continue the work they historically performed.

## D.    The public interest favors entering the requested injunction

"[T]here is a strong public interest in protecting confidential information and enforcing restrictive covenants, thereby promoting legitimate business interests." *Convergent Nonprofit Sols., LLC v. Wick*, 2019 WL 7423549, at *7 (M.D. Fla. Sept. 5, 2019). In this case, the public interest would be served by an injunction preventing CMG from using and profiting from Plaintiffs' confidential information. *Osborne Assocs., Inc.*, 2017 WL 5443146, at *16; *Rooterman LLC*, ___ F. Supp. 3d ___, 2025 WL 1088043, at *6; *Convergent Nonprofit Sols., LLC*, 2019 WL 7423549, at *7.

---

[71] *See* Crow Decl. ¶ 26.

**E.      CMG must be preliminarily enjoined to the same extent as Mayer**

"Florida courts have not hesitated to enforce noncompete agreements against both the employee who signed the agreement as well as against the corporation through which the ex-employee conducted business." *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1229 (M.D. Fla. 2002) ("straw man" tactic could not be used to avoid obligations under a non-solicitation agreement). "The Court can enjoin non-parties to the non-compete agreement, . . . where the nonparty is either under the signator's control *or otherwise being used to aid or abet the signator in violating the non-compete clause.*" *Family Heritage*, 319 So.3d at 685 (emphasis added).

In a span of months, CMG went from a local New Orleans operator to effectively become "Murphy 2.0," targeting the *same* customers, to offer the *same* technology, with the *same* employees that used to work for Murphy. In all respects, the evidence shows that this was only made possible by CMG's knowing, multi-year collaboration with Mayer, who divulged Murphy's customer information, secured CMG's competing technology license, and solicited dozens of Murphy employees to join CMG. Further, CMG's sudden expansion outside of New Orleans last year coincided perfectly with Mayer's efforts to begin steering CMG jobs in those other states—all so that Mayer and Gutierrez could receive millions by selling their company to Crown, while Mayer stayed at Murphy to "build the Goliath from within."

To support the status quo, the case law supports enjoining CMG to the same extent as Mayer. One analogous case is *Marine Turbo Eng'g, Ltd. v. Turbocharger Servs. Worldwide, LLC,* 2012 WL 13005808, at *10-12 (S.D. Fla. Jan. 6, 2012). There, the plaintiff had previously employed the defendant, Clemson, who signed a non-compete agreement. Prior to being terminated, Clemson secretly formed a competing company, "TSW," with help from another co-defendant, Da Motta. The plaintiff sued for breach of non-compete and sought an injunction enforcing the non-compete against Clemson, his new company TSW, and Da Motta. The Court agreed. Even though only Clemson was a signatory, the Court determined it was "appropriate to bind TSW and Da Motta to the covenant not to compete as the record demonstrates that these other the CMG Parties are identified in interest with Glyn Clemson and have been operating closely with him." *Id.* at *11 n.15.

A similar result obtained in *Dad's Props., Inc. v. Lucas*, 545 So.2d 926, 929 (Fla. Dist. Ct. App. 1989). There the defendant sold his business to the plaintiffs and executed a non-compete agreement. When the defendant was terminated, his wife formed a new company which immediately began competing. Plaintiff sought an injunction against the wife, arguing that defendant exercised "considerable control" over the new business. The court held that the wife and her company aided and abetted defendant in his initial violation of the covenant, and because of her close relationship to defendant, she too could be enjoined. *Id.*; *see also U.S. Lawns, Inc.*, 2016 WL 9526340, at *11 (enjoining former individual franchisees (who signed the non-compete) *and* their newly formed competing company).

In a similar vein, courts have enjoined corporate defendants from engaging in competitive activities where their very ability to compete is derived from the misappropriation of a plaintiff's confidential information, customer information, and goodwill. In *Southeastern Mech. Servs.*, three employees left their employment at the plaintiff ("SMS") to work for a company that competed with SMS in the maintenance and repair of steam-generating equipment. 2008 WL 4613046, at *2. The employees took SMS's confidential and proprietary information, which their new employer utilized to compete against SMS in a market where they were not previously active. On SMS's motion, the court enjoined the corporate defendants from engaging in the type of business they had *not* engaged in prior to hiring SMS's former employees, reasoning:

> Since the purpose of preliminary injunctive relief is to maintain the status quo, it is reasonable to prohibit [d]efendants from engaging in . . . *the type of work that [d]efendants were not providing (and were unable to provide) prior to [one of the corporate defendant's] hiring of [SMS's former employees]. . . . while permitting the corporate [d]efendants to compete for the type of projects they engaged in before* [hiring SMS's former employees].

*Id.* at *16-17 (emphasis added).

That is just what Plaintiffs seek here. CMG never engaged in trenchless pipeline rehabilitation services—or even worked outside of New Orleans—prior to receiving Mayer's financial and operational support, including the diversion of Murphy's confidential information and corporate opportunities. To preserve the status quo, it should be enjoined from competing with Plaintiffs pending trial.

## II. Plaintiffs Are Entitled To Expedited Discovery

Plaintiffs request the Court to allow limited expedited discovery as follows:

1.  that Mayer and Crown be ordered to resume, and complete within 14 days, their productions of responsive documents as set forth in the parties' February 28, 2025 Joint Status Report (Dkt. 26);

2.  that Plaintiffs be permitted to serve requests for production similar in form and substance to the requests attached as Exhibit 29 to the Fields Declaration, which requests that CMG and Gutierrez produce all documents and communications related to:

    o   CMG's formation and its investors;

    o   interactions with Mayer, Croxall, or Kinsella since January 1, 2024;

    o   references to Murphy, PURIS, or CompressionFit technology since January 1, 2024;

    o   each contract entered by CMG since January 1, 2024;

    o   the negotiation and licensure of Die Draw technology to CMG;

    o   CMG's audited and unaudited financial statements, including year-end and periodic balance sheets, income sheets, and profits and loss statements;

    o   any agreements with Mayer, Grafenauer, Crow, or any entity owned or controlled by them;

    o   any payments made to or received from Mayer, Grafenauer, Crow, or any entity owned or controlled by them; and

    o   documents and communications showing Defendants' retention, use, or disclosure of Plaintiffs' confidential information;

3.  that Plaintiffs be permitted to depose key witnesses, including but not limited to CMG, Gutierrez, Croxall, Grafenauer, Romero, and Mayer; and

4.  that Plaintiffs be granted leave to subpoena banks and financial institutions affiliated with CMG, Gutierrez, and Mayer by issuing subpoenas *duces tecum* similar in form and substance to those attached as Exhibit 30 to the Fields Declaration.

District courts may order discovery before the Rule 26(f) conference upon a showing of "good cause." *Platinum Mfg. Int'l, Inc. v. UniNet Imaging, Inc.*, 2008 WL 927558, at *1 (M.D. Fla. Apr. 4, 2008); *see* FED. R. CIV. P. 26(d)(1). Relevant factors include: (1) whether a motion for preliminary injunction is pending; (2) the breadth of discovery sought; (3) the reasons for requesting; (4) the burden on the opponent; and (5) how far in advance of the typical discovery process the request is made. *Sabal Trail Transmission, LLC v. 9.669 Acres of Land, More or Less, in Polk Cnty. Fla.*, 2016 WL 1729484, at *1 (M.D. Fla. Apr. 20, 2016). Good cause exists when the parties establish "a clear connection between the discovery sought and the alleged potential harm." *Charles Schwab & Co, Inc. v. McMurry*, 2008 WL 11334541, at *2 (M.D. Fla. July 14, 2008).

Here, the limited discovery proposed by Plaintiffs is reasonable because it will allow Plaintiffs to determine the full scope of CMG's and Gutierrez's unlawful conduct, including: to what extent they have misused Plaintiffs' confidential information, the extent of Mayer's financial interest and control, and the extent to which they have interfered with Murphy's business relationships. This information is essential to allow Plaintiffs the opportunity to prevail in preventing further irreparable harm, and the tailored requests will pose little burden to the CMG Parties.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court order the limited expedited discovery described herein, and upon

hearing, grant their request for a preliminary injunction preventing CMG and Gutierrez from soliciting Plaintiffs' customers or employees, and from providing trenchless pipe rehabilitation services, as well as such other and further relief as the Court deems reasonable and just.

Respectfully submitted and signed July 22, 2025.

| ALLEN OVERY SHEARMAN STERLING US LLP | GUNSTER YOAKLEY & STEWART, P.A. |
|---|---|
| */s/ Thad Behrens* | William K. Hill |
| Thad Behrens (*pro hac vice*) | Florida Bar Number 747180 |
| Jacob Fields (*pro hac vice*) | Lauren V. Purdy |
| Danielle Canfield Vorbrodt (*pro hac vice*) | Florida Bar Number 93943 |
| Carter Gantt (*pro hac vice pending*) | Rebecca A. Maturo |
| 2601 Olive Street, 17th Floor | Florida Bar Number 1049429 |
| Dallas, Texas 75201 | 1 Independent Drive, Suite 2300 |
| Telephone: (214) 271-5777 | Jacksonville Florida 32202 |
| thad.behrens@aoshearman.com | Telephone: (904) 354-1980 |
| jacob.fields@aoshearman.com | Facsimile: (904) 354-2170 |
| danni.vorbrodt@aoshearman.com | whill@gunster.com |
| carter.gantt@aoshearman.com | lpurdy@gunster.com |
| | rmaturo@gunster.com |

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2025, the foregoing was electronically filed and served on all parties' counsel of record via the Court's CM/ECF system.

*/s/ Thad Behrens*
Thad Behrens